STEVENS & Others *v.* MEMPHIS & CHARLESTON
    RAILROAD COMPANY & Others.

STEVENS & Others *v.* MEMPHIS, CLARKSVILLE &
    LOUISVILLE RAILROAD COMPANY & Others.

STEVENS & Others *v.* LOUISVILLE, NASHVILLE &
    GREAT SOUTHERN RAILROAD COMPANY.

STEVENS & Others *v.* MISSISSIPPI & TENNESSEE
    RAILROAD COMPANY.

STEVENS & Others *v.* MOBILE & OHIO RAILROAD
    COMPANY & Others.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE WESTERN DISTRICT OF TENNESSEE.

Argued October 23, 24, 27, 28, 29, 30, 1884.—Decided May 4, 1885.

STEVENS & Others *v.* CHICAGO, ST. LOUIS & NEW
    ORLEANS RAILROAD COMPANY & Others.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE WESTERN DISTRICT OF TENNESSEE.

Submitted January 15, 1885—Decided May 4, 1885.

Titles of Cases.

STEVENS & Others *v.* LOUISVILLE, NASHVILLE & GREAT SOUTHERN RAILROAD COMPANY.

STEVENS & Others *v.* NASHVILLE & NORTHWEST-ERN RAILROAD COMPANY & Others.

STEVENS & Others *v.* NASHVILLE & DECATUR RAIL-ROAD COMPANY & Others.

STEVENS & Others *v.* NASHVILLE & DECATUR RAIL-ROAD COMPANY & Others.

STEVENS & Others *v.* McMINNVILLE & MANCHESTER RAILROAD COMPANY & Others.

STEVENS & Others *v.* NASHVILLE, CHATTANOOGA & ST. LOUIS RAILWAY COMPANY & Others.

STEVENS & Others *v.* WINCHESTER & ALABAMA RAILROAD COMPANY & Others.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF TENNESSEE.

Argued October 23, 24, 27, 28, 29, 30, 1884.—Decided May 4, 1885.

STEVENS & Others *v.* CINCINNATI, CUMBERLAND GAP & CHARLESTON RAILROAD COMPANY & Others.

STEVENS & Others *v.* KNOXVILLE & KENTUCKY RAILROAD COMPANY & Others.

STEVENS & Others *v.* EAST TENNESSEE, VIRGINIA & GEORGIA RAILROAD COMPANY

STEVENS & Others *v* EAST TENNESSEE, VIRGINIA & GEORGIA RAILROAD COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF TENNESSEE.

Argued October 23, 24, 27, 28, 29, 30, 1884.—Decided May 4, 1885.

## Statement of Facts.

The Legislature of the State of Tennessee, on the 11th of February, 1852, enacted a law " to establish a system of internal improvements," in which it was provided that the State should issue to certain railroad companies therein named its negotiable coupon bonds, and that when the respective roads should be completed, the State should be invested with a lien upon each road and its superstructure and equipment, "for the payment of all of said bonds issued to the company, as provided in this act, and for the interest accruing on said bonds : " *Held*, in view of other provisions in the act, and, of the practical construction put upon it, that the lien thereby created, was created to secure payment to the State·of the amount of indebtedness it thus undertook to incur, and not payment to the holders of the State bonds thus agreed to be issued ; and that the State could accept payment in other mode or modes than those pointed out by the act or acts creating the lien, and could cause the property to be released from it, either by legislation, or by foreclosure under the statute, while the bonds issued to the company for the construction of the road released or foreclosed were still outstanding·and unpaid.

*Hand* v. *Savannah & Charleston Railroad Co.*, 13 S. C. 314, distinguished from this case.

*Sinking Fund Cases*, 99 U. S. 700, distinguished from this case.

The relation of principal debtor and creditor at no time existed under the acts of the Legislature of· Tennessee referred to in the opinion of the court, between the railroad companies and the holders of the State bonds issued under the act ; nor did the State at any time under those acts hold the relation of surety toward such· holders ; the State was at the outset and remained the sole debtor bound on the bonds.

These were suits brought by the holders of. unpaid bonds of the State of Tennessee, issued to various railroad companies under the act of February 11, 1852, " to establish a system of internal improvements," to enforce the lien which was vested in the State by that act on the property of the companies respectively as security for the payment of the bonds, and the accruing interest thereon. The sections of the act on which' the rights of the parties depend are §§ 1, 2, 3, 4, 5, 6, 7, 10, 12, 13 and 14. These are as follows:

" SECTION 1. *Be it enacted by the General Assembly of the State of Tennessee*, That whenever the East Tennessee and Virginia Railroad Company shall have procured *bona fide* subscriptions for the capital stock in said company to an amount sufficient to grade, bridge, and prepare for the iron rails the whole extent of the main trunk line proposed to be constructed by said company, and it shall be shown by said company to

the Governor of the State that said subscriptions are good and solvent, and whenever said company shall have graded, bridged, and shall have ready to put down the necessary timbers for the reception of rails, and fully prepared a section of thirty miles of said road at either terminus, in a good and substantial manner, with good materials, for putting on the iron rails and equipments, and the Governor shall be notified of these facts, and that said section, or any part thereof, is not subject to any lien whatever, other than those created in favor of the State by the acts of 1851–2, by the written affidavit of the chief engineers and President of said company, together with the written affidavit of a competent engineer by him appointed, at the cost of the company, to examine said section, then said Governor shall issue to said company *coupon* bonds of the State of Tennessee, to an amount not exceeding eight thousand dollars per mile on said section, and on no other conditions, which bonds shall be payable at such place in the United States as the President of the company may designate, bearing an interest of *six per centum per annum*, payable semi-annually, and not having more than forty nor less than thirty years to mature.

"Sec. 2. *Be it enacted*, That the bonds before specified shall not be used by said company for any other purpose than for procuring the iron rails, chairs, spikes and equipments for said section of said road, and for putting down said iron rails, and the Governor shall not issue the same unless upon the affidavit of said President, and a resolution of a majority of the board of directors, for the time being, that said bonds shall not be used for any other purpose than for procuring the said iron rails, chairs, spikes, and equipments for said section, and for putting down said iron rails, and the Governor shall have power to appoint a commissioner to act under oath, in conjunction with said President, in negotiating said bonds for the purposes aforesaid, and to act in any other matters pertaining to said company, where the interest of the State, in the opinion of the Governor, may require it.

"Sec. 3. *Be it enacted*, That so soon as the bonds of the State shall have been issued for the first section of the road as

aforesaid, they shall constitute a lien upon said section so pre-
pared as aforesaid, including the road-bed, right of way, grad-
ing, bridges, and masonry, upon all the stock subscribed for in
said company, and upon said iron rails, chairs, spikes, and equip-
ments, when purchased and delivered, and the State of Ten-
nessee, upon the issuance of said bonds, and by virtue of the
same, shall be invested with said lien or mortgage without a
deed from the company, for the payment by said company of
said bonds, with the interest thereon as the same becomes due.

" SEC. 4. *Be it enacted*, That when said company shall have
prepared as aforesaid a second section, or any additional num-
ber of sections, of twenty miles each of said road, connecting
with a section already completed for the iron rails, chairs,
spikes, and equipments, as provided in the first section of this
act, and the Governor shall be notified of the facts as before
provided, he shall, in like manner, issue to said company like
bonds of the State of Tennessee, to an equal amount with that
before issued under the first section of this act, for each and
every section of twenty miles of said road so prepared as afore-
said, but upon the terms and conditions hereinbefore provided,
and upon the issuance of the said bonds the State of Tennessee
shall be invested with a like mortgage or lien without a deed
from said company, upon said stock, and upon said first and
additional section or sections of said road so prepared, upon
the rails and equipments put, or to be put, upon the same, for
the payment of said bonds and the accruing interest thereon :
*Provided*, That if the last section of said road shall be less than
twenty miles, or if the railroad proposed to be constructed by
any company hereinafter specified shall be less than thirty miles
in extent, bonds of the State shall be issued for such section, or
such railroad, as may be less than thirty miles in extent for an
amount in proportion to the distance, as provided in this act,
but upon the same terms and conditions in all respects, as re-
quired in regard to the bonds to be issued for the other sections
of said road.   And when the whole of said road shall be com-
pleted the State of Tennessee shall be invested with a lien
without a deed from the company, upon the entire road, includ-
ing the stock, right of way, grading, bridging, masonry, iron

rails, spikes, chairs, and the whole superstructure and equipments, and all the property owned by the company as incident to or necessary for its business, and all depots, and depot stations, for the payment of all of said bonds issued to the company as provided in this act, and for the interest accruing on said bonds. And after the Governor shall have issued bonds for the first section of the road, it shall not be lawful for the said company to give, create, or convey to any person or persons, or body corporate whatever, any lien, incumbrance, or mortgage of any kind which shall have priority over, or come in conflict with, the lien of the State herein secured; and any such lien, incumbrance, or mortgage shall be null and void as against said lien or mortgage of the State, and the said lien or mortgage of the State shall have priority over all other claims existing or to exist against said company.

" SEC. 5. *Be it enacted*, That it shall be the duty of said company to deposit in the Bank of Tennessee, at Nashville, at least fifteen days before the interest becomes due, from time to time, upon said bonds issued as aforesaid, an amount sufficient to pay such interest, including exchange and necessary commissions, or satisfactory evidence that said interest has been paid or provided for, and if said company fail to deposit said interest as aforesaid, or furnish the evidence aforesaid, it shall be the duty of the Comptroller to report that fact to the Governor, and the Governor shall immediately appoint some suitable person or persons, at the expense of the company, to take possession and control of said-railroad, and all the assets thereof, and manage the same and receive the rents, issues, profits, and dividends thereof, whose duty it shall be to give bond and security to the State of Tennessee, in such penalty as the Governor may require, for the faithful discharge of his or their duty as receiver or receivers, to receive said rents, issues, profits, and dividends, and pay over the same, under the direction of the Governor, toward the liquidation of such unpaid interest. And if said company fail or refuse to deliver up said road to the person or persons so appointed by the Governor, the person so appointed shall report that fact to the Governor, who shall forthwith issue his warrant, directed to the sheriffs of the coun-

ties through which said road shall run, commanding them to take possession of said road, fixtures, and equipments, and everything pertaining thereto, and place the said receiver in full and complete possession of the same, and said receiver so appointed shall continue in the possession of said road, fixtures, and equipments, and run the same, and manage the entire road, until a sufficient sum shall be realized, exclusive of the costs and expenses incident to said proceedings, to pay off and discharge the interest as aforesaid, due on said bonds, which being done, the receiver shall surrender said road and fixtures and equipments to said company. The Comptroller shall from time to time settle the accounts with the receiver, and the balance shall be deposited in the Treasury of the State. The Comptroller is authorized, and it is made his duty, upon his warrant to draw from the Treasury any sum of money necessary to meet the interest on such bonds, as may not be provided for by the company, as provided for in this act, and the Comptroller shall report thereof to the General Assembly from time to time.

"SEC. 6. *Be it enacted,* That if said company shall fail or refuse to pay any of said bonds when they fall due, it shall be the duty of the Governor to notify the Attorney General of the district in which is situated the place of business of said company of the fact; and thereupon, said Attorney General shall forthwith file a bill against said company, in the name of the State of Tennessee, in the chancery or circuit court of the county in which is situated said place of business, setting forth the facts, and thereupon said court shall make all such orders and decrees in said cause as may be deemed necessary by the court, to secure the payment of said bonds, with the interest thereon, and to indemnify the State of Tennessee against any loss on account of the issuance of said bonds, by ordering the said railroad to be placed in the hands of a receiver, ordering the sale of said road, and all the property and assets attached thereto or belonging to said company, or in such other manner as the court may deem best for the interest of the State.

"SEC. 7. *Be it enacted,* That at the end of five years after the completion of said road, said company shall set apart one

*per centum per annum* upon the amount of bonds issued to the company, and shall use the same in the purchase of bonds of the State of Tennessee, which bonds the company shall pay into the Treasury of the State, after assigning them to the Governor, and for which the Governor shall give said company a receipt, and as between the State and said company, the bonds so paid in shall be a credit on the bonds issued to the company; and bonds so paid in, and the interest accruing thereon, from time to time, shall be held and used by the State as a sinking fund for the payment of the bonds issued to the company, and should said company repurchase any of the bonds issued to it under the provisions of this act, they shall be a credit as aforesaid, and cancelled. And should said company fail to comply with the provisions of this section, it shall be proceeded against, as provided in the fifth section of this act."

" Sec. 10. *Be it enacted*, That the provisions of this act shall extend to and embrace the Chattanooga, Harrison, Georgetown and Charleston Railroad Company, the Nashville and Northwestern Railroad Company, the Louisville and Nashville Railroad Company, the Southwestern Railroad Company, the McMinnville and Manchester Railroad Company, the Memphis and Charleston Railroad Company, the Nashville and Southern Railroad Company, the Mobile and Ohio Railroad Company, the Nashville and Memphis Railroad Company, the Nashville and Cincinnati Railroad Company, the East Tennessee and Georgia Railroad Company, the Memphis, Clarksville and Louisville Railroad Company, and the Winchester and Alabama Railroad Company, so far as the main trunk roads to be constructed by said companies lie within the limits of this State, and not otherwise, and said companies shall have all the powers and privileges and be subject to all the restrictions and liabilities contained in this act. . . ."

" Sec. 12. *Be it enacted*, That the State of Tennessee expressly reserves the right to enact by the legislature thereof, hereafter, all such laws as may be deemed necessary to protect the interest of the State, and to secure the State against any loss in consequence of the issuance of bonds under the provi-

sions of this act. But in such manner as not to impair the vested rights of the stockholders of the companies.

"SEC. 13. *Be it enacted*, That it shall be the duty of the Governor, from time to time, when there shall be reliable information given to him that any railroad company shall have fraudulently obtained the issuance of bonds of the State, or shall have obtained any of said bonds contrary to the provisions of this act, he shall notify the Attorney-General of this State, whose duty it shall be forthwith to institute, in the name of the State, a suit in the Circuit or Chancery Court of the county of the place of business of the company, setting forth the facts. And when the fact shall satisfactorily appear to the court that any of said bonds shall have been fraudulently obtained, or obtained contrary to the true intent, meaning and provisions of this act, then, and in such case, the court shall order, adjudge and decree, that said road lying in the State, with all the property and assets of said company, or a sufficiency thereof, shall be sold, and the proceeds shall be paid into the treasury, and it shall be the duty of the Comptroller immediately to vest the same in stocks, creating a sinking fund, as provided for in the seventh section of this act. And said company shall forfeit all rights and privileges under the provisions of this act. And the stockholders thereof shall be individually liable for the payment of the bonds so fraudulently obtained by such company, and for all other losses that may fall upon the State in consequence of the commission of any other fraud by such company, excepting such stockholders as may show to the said court that they were ignorant of or opposed the perpetration of such frauds by the company.

"SEC. 14. *Be it enacted*, That in the event any of the roads, fixtures, or property belonging to any of said roads shall be sold under the provisions of this act, it shall be the duty of the Governor to appoint an agent for the State, who shall attend said sale and protect the interest of the State, and shall, if necessary to protect said interest, buy in said road or property, in the name of the State; and in case said agent shall purchase said road for the State, the Governor shall appoint a receiver, who shall take possession of said road and property.

and use the same as provided for in the fifth section of this act, and said receiver shall settle with the Comptroller semi-annually until the next meeting of the General Assembly."

On the 21st of February, 1852, an act was passed providing for the identification of the bonds to be issued to the several companies under the act of February 11, the material parts of which are §§ 7, 8, and 9, as follows:

" Sec. 7. *Be it further enacted,* That the different internal improvement companies, to whom the bonds of the State may be lent under the different acts of the present legislature, shall pay the expenses of engraving and preparing the same.

" Sec. 8. *Be it enacted,* That the Governor of the State shall cause to be engraved and printed the bonds which may be issued under the acts of the present General Assembly, as a loan to internal improvement companies, and the said bonds shall bear date on the first day of January prior to their issuance, and the coupons thereto shall be payable on the first days of January and July of each year.

" Sec. 9. *Be it enacted,* That the coupons shall be signed and numbered by the Comptroller, and the bonds shall be countersigned, sealed, and numbered by the Secretary of State, and upon delivering said bonds to the company authorized to receive the same, the Secretary of State shall take a receipt, reciting the number, date and amount of said bonds, in a well-bound book to be deposited in his office, and the Comptroller and Secretary of State shall each be entitled to receive twenty-five cents for each bond so prepared, to be paid by the party receiving the said bond."

By §§ 5 and 6 of an act of February 21, 1856, the sinking fund provisions of the act of 1852 were changed as follows:

" Sec. 5. *Be it further enacted,* That it shall be the duty of the several railroad companies in this State, who have received, or may hereafter receive, bonds of the State, or the indorsement of their bonds by the State to aid in the construction of their several roads, under the provisions of the act of 1851–1852, and the acts amendatory thereto, at the expiration of five years from the issuance or indorsement of their said several bonds, annually to set apart and pay over to the Treasurer of the

State two per cent. per annum upon all bonds which have been or may hereafter be issued or indorsed as aforesaid, as a sinking fund for the ultimate redemption of the bonds issued or indorsed as aforesaid; which sinking fund, when paid over, the Governor, Comptroller of the Treasury, and President of the Bank of Tennessee shall invest in the bonds of the State, and reinvest all accruing interest in like securities; and they are hereby constituted a Board of Commissioners for the management, government, and control of said sinking fund.

"SEC. 6. *Be it further enacted,* That should any of said railroad companies fail, or refuse to comply with the provisions of the fifth section of this act, it shall be the duty of the Governor forthwith to notify the Attorney General of the district in which is situated the place of business of said company failing or refusing as aforesaid, of the fact; and thereupon the Attorney General shall immediately proceed against said company to collect said sinking fund, in the manner prescribed in the sixth section of an act entitled 'An Act to establish a system of internal improvements in this State,' passed February 11, 1852."

By another act, passed March 20, 1860, the same provisions were further amended as follows:

"SEC. 1. *Be it enacted by the General Assembly of Tennessee,* That the money or bonds that have heretofore or may be paid by the cities or railroad companies in this State to the Sinking Fund Commissioners by the 1st of January, 1860, together with the accruing interest thereon to that date, shall be passed directly to the credit of the party having so paid the same, and be a release to said party for that amount on the debt due by them to the State of Tennessee.

"SEC. 2. Said bonds shall all be cancelled by said Commissioners, and if indorsed bonds of any railroad company shall be cancelled as hereinafter provided for the cancellation of State bonds, and shall be delivered over to said company or corporation, taking the President's of said company, or the officers' of said company receipt for the same, which receipt shall be filed and the copy of the same placed upon a book, which the said Commissioners shall keep for that purpose. If

State bonds, they shall be cancelled and filed in the office of the Secretary of State as hereinafter provided.

"SEC. 3. That after the first day of January, 1860, all railroad companies or city corporations who have or may hereafter receive the 'bonds of the State, or its indorsement of their own bonds under the general internal improvement law of this State, or any other law, shall be required to pay two and one-half per cent. per annum as a sinking fund on the amount of the bonds so issued or indorsed by the State for said company or corporation, to be paid in equal instalments on the first days of April and October, five years after the date of said bonds, and annually thereafter.

"SEC. 4. All bonds issued during any one year shall be dated on the 1st day of January of that year. .

"SEC. 5. Said companies or corporations may pay said sinking fund in cash or in the like character of bonds that may have been issued or indorsed by the State for said company at their face or par value.

"SEC. 6. If paid in money, the Commissioners shall invest it immediately in the bonds of the State, and shall have the same cancelled and filed as heretofore provided. Such bonds are to be of the same character as those issued to such company or corporation.

"SEC. 7. The sinking fund, when paid, in all cases shall be passed directly to the credit of said company or corporation, and be a release to said company or corporation from that amount due by them to the State. The Commissioners shall issue a receipt to each company or corporation for such payment, retaining a duplicate in a well-bound book kept for that purpose.

"SEC. 8. Each and every railroad company or city corporation shall provide the interest semi-annually, as now provided by law, on the amount of bonds unpaid at the time said interest falls due, and not on the original amount issued to or indorsed by the State for said company as heretofore provided.

"SEC. 9. The Comptroller of the State shall keep a regular account against each company or corporation, charging them with the amount of bonds originally issued to or indorsed for

said company or corporation by the State, and crediting them by the amount of sinking fund paid, and shall furnish the Treasurer of State a statement of the amount due by each company or corporation on the first of June and December of each year, that he may know how much interest each company or corporation has to pay.

" SEC. 10. The Commissioners of the Sinking Fund shall cancel all bonds of the State as soon as paid in or purchased, by cutting out the Governor's and Secretary of State's names, and so defacing each coupon that it cannot by possibility be used or circulated, and shall file the same in the Secretary of State's office.

" SEC. 11. This law shall be in full force from and after its passage, and shall repeal all laws in conflict with it, but shall not be so construed as *otherwise* to affect any law on the subject of the sinking fund or the payment of interest due on state or indorsed bonds."

Under these statutes state bonds were from time to time issued to the several enumerated railroad companies in the following form:

" $1,000.                                    $1,000.
No.    UNITED STATES OF AMERICA.    No.

" Know all men by these presents: That the State of Tennessee acknowledges to owe to                    , or order, One Thousand Dollars of the lawful money of the United States of America, which the said State promises to pay in the city of New York, on the          day of          , 18   , with interest thereon, at the rate of six per cent. per annum, according to the tenor, and upon the presentation of the coupons hereunto attached. For the payments of said sums of money, and the interest thereon, at the times and places, and in the manner aforesaid, the faith of the said State of Tennessee is irrevocably pledged, this bond being issued in pursuance and by authority of an act of the General Assembly of said State, passed February 11th, 1852, to establish a system of Internal Improvements in said State.

" In testimony whereof, and in pursuance of the acts afore-

said, I,        , Governor of the State of Tennessee, have hereunto subscribed my name officially, and caused the same to be countersigned by the Secretary of State, with the great seal of the State affixed.

"[    ]   Done at the Executive Department in the city of Nashville, this       day of       , 18 ."

To which was attached the following form of coupon:

"30.     THE TREASURER        STATE OF    30.
         OF THE        TENNESSEE.

"Will pay the bearer THIRTY DOLLARS, in the city of New York, on the——day of——18—, being the semi-annual interest then falling due on bond No.

                         "J. C. SUTTRELL,    30.
                            " *Comptroller.*"

Upon the issue of the bonds, receipts were executed by the companies respectively, in the form required by the statute, in a well-bound book deposited in the office of the Secretary of State. The bonds, after their delivery, were sold in the market by the respective companies, in conjunction with the State commissioner, and the proceeds used in the way contemplated by the statute.

No complaint was made of any default on the part of the several companies whose roads were involved in these suits, prior to the late civil war. After the beginning of the war, however, but few payments were made, and various expedients were resorted to, from time to time, for relieving the companies from their embarrassments. In 1866, another act was passed authorizing a further issue of State bonds, under which some of the bonds embraced in these suits were put out. In this act the provisions as to the lien for the security of the payment of the bonds was substantially the same as in the act of 1852. None of these devices, however, accomplished the purpose the State had in view, and on the 25th of February, 1869, "An Act to liquidate the State debt, contracted in aid of railroad companies in the State of Tennessee," was passed. That act is as follows:

"Whereas, under the General Internal Improvement Laws of the State, passed from time to time, aid has been granted to various Railroad Companies by the loaning of the six per cent. bonds of the State, to enable said companies to iron, equip, build and bridge, and for other purposes, which is now secured to the State by a first mortgage or lien on the franchise, property and fixtures of respective Railroad Companies; and

"Whereas, it is desirable for the general welfare of the State that the State shall be reimbursed such amounts as have been advanced to the different Railroad Companies, as fast as may be practicable; therefore,

"Section 1. *Be it enacted by the General Assembly of the State of Tennessee*, That the respective Railroad Companies, or either of them that have created indebtedness to the State, are hereby authorized to repay any amount of the principal of such indebtedness as they have respectively created in the bonds of the State, in such amount and at such times as may be practicable: *Provided*, however, That nothing in this act shall be so construed as to release said Railroad Companies from any lien which the State may have on the same for any unpaid interest now due on said bonds of the State authorized to be surrendered by this Act.

"Sec. 2. *Be it further enacted*, That any Railroad Company or Companies repaying any indebtedness due the State under the provisions of this Act, are authorized to issue bonds of equal amount and denomination with the bonds of the State paid and delivered up for cancellation, as hereinafter provided, which said railroad bonds, so issued in lieu of any equal amount of State bonds, shall be certified to by the Comptroller, and entered in a book to be kept for that purpose, with date, number, and amount, and shall be a lien, *pro rata* in amount and of equal validity and effect with the unretired part of the State indebtedness upon such railroad, and all its property, franchises, fixtures, and material.

"Sec. 3. *Be it further enacted*, That in order to facilitate the Railroad Companies that may wish to avail themselves of the provisions of this Act in repaying the indebtedness due to the State respectively, they, or any of them, are hereby author-

ized to consolidate their property, in whole or in part, with other Railroad Companies, and issue bonds and stock as provided for in the second section of this Act, and may adopt the corporate franchise of either of the roads as the stockholders may elect, and each Railroad Company paying its indebtedness, and such Railroad Companies as may consolidate under the provisions of this Act, are hereby authorized to determine, by a vote of the stockholders of said Company or consolidated Companies, the number of directors of such Company, and elect the same under the new organization, and that the said directors, so elected, shall, according to the by-laws and rules of said corporation, elect one of their number President of said Company.

"SEC. 4. *Be it further enacted,* that the Comptroller of the State shall receive from the Railroad Companies, or any of them, bonds of the State in such amounts as may be presented, and cancel the same in the presence of the officer or agent of the Railroad Company paying them in, and execute to the said Railroad Company or Companies duplicate receipts for the amount and number of said bonds so paid in, and it shall further be the duty of the Comptroller to certify on the bonds of any Railroad Company or Companies repaying indebtedness due to the State, that the same has been paid, and that the so certified [bonds] are secured by first mortgage: *Provided,* That said Railroad Companies shall liquidate their indebtednes prior to the maturity of the bonds that have caused said indebtedness. *And be it further provided,* that said bonds, when executed by the respective Railroad Companies, or either of them, shall be deposited with the Comptroller of the State, whose duty it shall be to deliver said bonds, or any number of them, to the President and Directors of the Company, on the deposit by said President and Directors or authorized agent of an equal amount of the six per cent. bonds of the State of Tennessee, with unpaid coupons attached, and the Company's first mortgage bonds, authorized to be issued by this Act, shall have no validity or value except the Comptroller's certificate is affixed on the face of each bond, that said bond is executed, and issued and by virtue of law taken the place of a bond of the State and is the first mortgage bond.

"Sec. 5. *Be it further enacted*, That the Comptroller shall be entitled to a fee of one dollar on each thousand dollars of bonds certified as aforesaid, to be paid by the Railroad Company for which the same is done; and it shall be lawful for the Comptroller to discharge the duties imposed by this Act, by and through an agent in the city of New York; and all the provisions of this Act shall attach to and become a part of the charter of any Railroad Company or Companies acting under it.

"Sec. 6. *Be it further enacted*, That by and with the consent of the Board of Directors of any Railroad Company in this State under the General Improvement Law passed the 11th of February, 1852, and all the amendments thereto, that any person or corporation may, by paying the indebtedness of such Railroad Company to the State in the bonds of the State, as provided for by law, be, and they are hereby, substituted and entitled to all the liens against said company for the payment of said debt that the State had or has by law, and the Governor and Secretary of State shall give such party or parties paying such indebtedness a certificate showing the facts, which shall be evidence against said Company of such indebtedness to said individuals or corporations.

. "Sec. 7. *Be it further enacted*, That any person or persons may, with the consent and approbation. of any Railroad Company, which is indebted to, and for which the State of Tennessee holds a lien, pay the said debt, so far as the State is concerned, in the bonds of the State, or any coupons of bonds at par, and the person or persons so paying the debt of any Railroad Company with the consent of such Railroad Company, shall, upon filing with the Treasurer of this State the written assent of said Railroad Company, under the corporate seal of said Railroad Company, be entitled to have and hold all the lien or liens which the State of Tennessee had or has upon said railroad or its property, and shall have the same right to enforce the same which the State of Tennessee had, the object and intent being to place the person or persons so paying with the consent of said Railroad Company in the same position and with the same rights which the State of Tennessee had

previous to and before the said payment, and with full power to enforce the same.

"SEC. 8. *Be it further enacted*, That any person or persons who may, with the consent and approbation of any Railroad Company pay any part or portion of the indebtedness of such company, as provided in sec.—, shall have, hold, and [be] subrogated in all the rights, privileges, and lien or liens of the State, to the extent of, and in proportion to, the amount of such indebtedness, with the same rights and privileges the State now has, to the extent of such payment or payments: *Provided*, The passage of this Act shall not decrease the lien of the State upon any railroad of the State until the entire claim of the State is fully liquidated, or affect the interest of the present bondholders of the State: *Provided*, That Railroad Companies which have issued second mortgage bonds, availing themselves of the provisions of this Act, shall file with the Comptroller bonds of the same series as those loaned to such company, for which the State holds a first mortgage lien: *Provided*, The bonds to be issued by the company, under the provisions of this Act, shall not have a longer time to run than the bonds of the State thus released and cancelled.

"SEC. 9. *Be it further enacted*, That this Act shall take effect from and after its passage."

At the next session of the General Assembly, January 20, 1870, this act was amended as follows:

"AN ACT for the Payment of the State Debt.

"SEC. 1. *Be it enacted by the General Assembly of the State of Tennessee*, That an Act entitled 'An Act to liquidate the State debt, contracted in aid of railroad companies in the State of Tennessee,' passed February 25, 1869, be, and the same is hereby, amended, so as to allow any railroad company which may be indebted to the State by reason of the bonds of the State loaned to said railroad company, to pay into the State, in liquidation of the principal of said indebtedness, any of the legally issued six per cent. bonds of the State of Tennessee outstanding, without regard to series or number; and such

payment shall, to the extent made, be a full and perfect discharge of the lien which the State holds upon the property of such railroad company, held by virtue of the bonds of the State issued to such railroad company, whether they be the same bonds or the same series of bonds issued to said company under the Act passed February 11, 1852, and Acts amendatory thereof, or not.

" SEC. 2. *Be it further enacted*, That railroad companies issuing their own mortgage bonds under the provisions of the Act which this is intended to amend, be allowed to fix the rate of interest which the said bonds of the railroad company are to bear, and all laws in conflict are hereby repealed: *Provided*, that when said railroad companies owe interest already due, coupons past due shall be taken by the Comptroller or Treasurer in discharge of such indebtedness for interest.

" SEC. 3. *Be it further enacted*, That when any company, under the provisions of this Act, shall pay into the Treasury of the State bonds which have been issued by the State to said company, the said bonds shall be cancelled; but should any company, in discharge of its own debts, pay into the Treasury any bonds that were issued to other companies that may still be indebted to the State, such bonds so paid in shall not be cancelled, but shall be held by the State as purchased bonds; retaining a lien for the State upon the road to which said bonds were originally issued until the debt of said road to the State shall be fully discharged, when the bonds so held shall be cancelled: *Provided*, that the provisions of this Act shall not be so construed as to allow the payment and satisfaction of debts created by bonds issued by the State, and upon which the State is secondarily liable, nor to the payment of the sinking fund, now required by law, of the railroad companies of this State.

" SEC. 4. *Be it further enacted*, That this act shall take effect from and after its passage."

Under these statutes the companies whose roads were involved in the present suits against the Memphis and Charleston Railroad Company, the Louisville, Nashville and Great Southern Railroad Company, the Nashville and Decatur Railroad Com-

pany, the Nashville, Chattanooga and St. Louis Railroad Company, the East Tennessee, Virginia and Georgia Railroad Company, the Chicago, St. Louis and New Orleans Railroad Company, the Memphis and Tennessee Railroad Company, and the Mobile and Ohio Railroad Company, by the use of substitution bonds or otherwise, obtained from the State a discharge of the liens upon their property under the act of February 11, 1852, and the acts amendatory thereof, so far as the State had the right to execute such a discharge. In doing so, however, they used, to some extent, other State bonds than those which were issued to them originally under the provisions of the act. The bonds so issued and not returned to the State, constituted the cause of action on which these suits were brought against the companies above named.

To provide for cases where the companies failed to meet their obligations to the State under the act of 1852, and did not comply with the provisions of the acts of 1869 and 1870, an act of December 21, 1870, was passed, in which, after reciting as follows: " *Whereas*, in the recent attempt to sell the State's interest in said roads, various legal questions arose, presenting serious obstacles to a sale under the act of 1870, which it is deemed expedient and necessary to obviate before the interest of the State in said roads shall be again offered for sale; and *whereas*, by the act of 1852, chapter 151, § 12, the right is expressly reserved to the State to enact all such laws in the future as should be deemed necessary to protect the interest of the State, and to secure the State against any loss in consequence of the issuance of bonds under the provisions of said act, in such manner as not to impair the vested rights of stockholders of the companies," provision was made for a summary proceeding to foreclose the lien vested in the State, under the act of 1852 and the several amendatory acts, by filing a bill in equity, in the Court of Chancery at Nashville, against the delinquent companies, to obtain a decree for the sale of the interest of the State in their property. In this act it was provided, that the purchase-money might " be discharged in any of the outstanding legal bonds of the State," and that, upon the sale of any of the franchises of either of the companies," all

the rights, privileges and immunities appertaining to the franchises so sold under its act of incorporation and the amendments thereto, and the general improvement law of the State, and acts amendatory thereof, shall be transferred to and vest in such purchaser, and the purchaser shall hold said franchise subject to all liens and liabilities in favor of the State, as now provided by law, against the railroad companies."

Under the provisions of this act the liens on the roads involved in the suits against the Memphis, Clarksville and Louisville Railroad Company, the Nashville and Northwestern Railroad Company, the McMinnville and Manchester Railroad Company, the Winchester and Alabama Railroad Company, the Cincinnati, Cumberland Gap and Charleston Railroad Company, and the Knoxville and Kentucky Railroad Company were all foreclosed, and the property sold under decrees which reserved the lien of the State referred to in the statute, "as far as may be necessary to secure the purchase-money as aforesaid, and the other rights of the State under the decree in this cause and the said acts of the legislature." Payments of the purchase-money were made in bonds of the State of Tennessee without distinction. Bonds of the State issued to the companies that constructed the foreclosed roads, not taken up at these sales or otherwise by the State, were the causes of action embraced in the suits against the last-named companies, and the defendants in those suits claimed the property under the purchases at the foreclosure sales, free of all liens in favor of the State or its bondholders.

The Circuit Courts dismissed the bills in all the suits, and these appeals were taken from the several decrees to that effect.

*Mr. George Hoadly* and *Mr. Wager Swayne* for appellants. *Mr. Hoadly's* brief was also signed by *Mr. Edward L. Andrews, Mr. John C. F. Gardner, Mr. Edgar M. Johnson* and *Mr. Edward Colston.* *Mr. Swayne's* brief was also signed by *Mr. W. L. Pierce, Jr.*

*Mr. Charles F. Southmayd* for Memphis & Charleston Railroad Company, East Tennessee, Virginia & Georgia Railroad

Company, and Cincinnati, Cumberland Gap & Charleston Railroad Company, appellees.

Mr. *Edward Baxter* for Louisville & Nashville Railroad Company, Nashville & Decatur Railroad Company, and Memphis, Clarksville & Louisville Railroad Company, appellees.

Mr. *William M. Ramsey* for John B. Smith, Trustee of the mortgage of the Memphis & Ohio Railroad, the Memphis, Clarksville & Louisville Railroad, and the Louisville & Nashville Railroad, appellee.

Mr. *E. H. East* for Nashville, Chattanooga & St. Louis Railroad Company, Nashville & Northwestern Railroad Company, McMinnville & Manchester Railroad Company, and Winchester & Alabama Railroad Company, appellees.

Mr. *P. Hamilton* for Mobile & Ohio Railroad Company, appellee.

Mr. *John A. Campbell* for Mobile & Ohio Railroad Company, Chicago, St. Louis & New Orleans Railroad Company, and Illinois Central Railroad Company, appellees.

Mr. *James Fentress* filed a brief for Chicago, St. Louis & New Orleans Railroad Company, appellee.

Mr. *J. B. Heiskell* filed a brief for Memphis & Charleston Railroad Company, appellee.

Mr. *William M. Baxter* filed a brief for Knoxville & Kentucky Railroad Company and Knoxville & Ohio Railroad Company, appellees.

Mr. *George Brown*, Mr. *James T. Shields* and Mr. *John K. Shields* filed a brief for East Tennessee, Virginia & Georgia Railroad Company, appellee.

*Mr. D. H.* and *Mr. W. K. Poston*, filed a brief for Memphis and Charleston Railroad Company and East Tennessee and Virginia Railroad Company, appellees.

*Mr. L. W. Humes* filed a brief for Memphis & Charleston Railroad Company, appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court. After stating the facts as above recited, he continued:

The question which lies at the foundation of all these suits is, whether the statutory lien with which the State of Tennessee was invested, upon the issue of its bonds to railroad companies under the internal improvement act of February 11, 1852, and the several acts amendatory thereof, bound the property of the company to which the issue was made for the payment of the bonds so issued, and the interest thereon, to the several holders thereof, or only to the State; for, if to the State alone, it is conceded the lien has been discharged, and is no longer operative. The precise point of the inquiry is, for whose benefit was the lien created? Was it the State, or the bondholders, or both the State and the bondholders?

The lien which was vested in the State was as security for the payment by the company of "all of said bonds issued to the company, as provided in this act, and for the interest accruing on said bonds." This is the language of the provision for the final lien which was to attach on the completion of the whole road, to "all the property owned by the company, as incident to, or necessary for, its business." § 4. To whom this payment was to be made is nowhere stated in express terms. In the absence of anything to the contrary, the implication would undoubtedly be that it must be to the holder of the bond, as he was the person to whom the bond, as a bond, was payable; but if, on an examination of the whole statute in the light of surrounding circumstances, and interpreting it with reference to the subject matter of the legislation, it appears that the intention was to secure only a payment to the State of the debt incurred by the company on the loan of the bonds, there is nothing in the language employed to express the legis-

lative will which necessarily extends the operation of the statute beyond what is required to give effect to such an intention. It may be that the legislature used the phrase " payment of the bonds and the accruing interest thereon " to express the idea of " payment to the State for the bonds," and, if it did, the statutory lien will stand only as security for such a payment.

The liability of the companies to the bondholders, if any there be, rests alone on the statute, which contemplated loans by the State of its own bonds to the several companies in aid of the public works they were respectively engaged in constructing. The bonds were to be " coupon bonds of the State of Tennessee." This implies State bonds with coupons for interest attached, in the ordinary form then in use, whereby the faith of a State of the United States was pledged for their payment. Such must have been the understanding of all parties at the time, for the bonds actually issued were of that kind, and on their face bound only the State. The law made no provision for naming, either in or upon a bond, the particular company in whose favor it was issued. Neither did the bonds themselves, as issued, contain, by indorsement or otherwise, any obligation whatever on the part of the companies. They were State bonds, pure and simple, " issued in pursuance and by authority of an act of the General Assembly of said State, passed February 11th, 1852." They were not even made payable to the companies to which they were respectively issued, but went on the market as coupon bonds of the State of Tennessee, payable to the bearer thereof, and apparently nothing else. In this form they were bought and sold by dealers and investors in public securities. So that the point to be determined from an examination of the statute, is, whether a State, when lending its own bonds and taking back security for their payment, intended to protect those who might afterwards become the holders of the bonds against the consequences of its own repudiation or inability to pay, or only to indemnify itself against loss by reason of the loan of its credit to those who were engaged in constructing its great works of internal improvement. To say the least, the strong presumption is that, in such a transaction, the purpose of a State would be to pro-

tect itself, and not to secure its own pledge of faith to the bond-holders by a mortgage from those to whom its credit was loaned.

Such being the subject matter of the legislation, we proceed to inquire what the payment was which the State intended to secure by the statutory lien with which it was to be invested. It was to be a *payment*. This implies a debt from him who pays to him who is to receive, and that when the payment is complete the debt will be discharged. It is not claimed that a borrowing company was to incur two debts by accepting a loan under the statute, one to the State and the other to those who might become the purchasers or holders of the borrowed bonds. The obligation was to pay the bonds once, not twice, and the payment was to be made at the time and in the way provided by the law. Who then became the creditor of the borrowing company when it incurred its debt for the borrowed bonds? Was it the State or the bondholders?

Much stress was laid in the argument on the provision in § 3, "that so soon as the bonds of the State shall be issued . . . they shall constitute a lien," etc.; and it was insisted that, as the bond constitutes the lien, and the lien is but an incident of the debt, the lien must continue and follow the bond in the hands of the holder thereof, until it is finally paid and taken up by the company. From this it was argued that the bondholder must be the creditor, within the meaning of the statute, and that a payment would not be complete so as to discharge the debt of the company, until it was made to him.

Similar language was used in a statute of South Carolina, passed December 20, 1856, to aid in the construction of the Charleston and Savannah Railroad, under which the State guaranteed, by indorsement, the bonds of the railroad company, and it was provided "that so soon as any such bonds shall have been indorsed as aforesaid . . . they shall con. stitute a lien," etc. This, it was held by the Supreme Court of that State in *Hand* v. *Savannah & Charleston Railroad Co.*, 12 S. C. 314, vested in the State a lien, not merely for its own protection against the guaranty, but also for the

better security of the bonds themselves into whosesoever hands they might fall. But, as this court had occasion to say in *Railroad Companies* v. *Schutte,* 103 U. S. 118, 140, "contracts created by, or entered into under, the authority of statutes, are to be interpreted according to the language used in each particular case to express the obligation assumed. . . . Every statute, like every contract, must be read by itself, and it no more follows that one statutory contract is like another, than that one ordinary contract means what another does. . . . It must be determined from the language, used in each particular case, what has been done, or agreed to be done, in that case." Under the South Carolina statute the primary liability for the payment of the bonds to the respective holders thereof, rested on the company, and the State was bound only as surety. This was shown on the face of the bonds themselves, and the language of the statute was, therefore, to be construed with that as the subject matter of the legislation, that is to say, a guaranty by the State of the obligations of the railroad company. Here the State is the primary obligor, and the legislation is with reference to a loan of State bonds, on which the railroad companies are in no way to appear as bound. The liability of the companies grows out of the borrowing of State bonds, to be sold in the market as State bonds, and apparently nothing but State bonds. The loans were to be by the State to the companies, and the object was to secure the payment of the loans. It may well be that the same language when applied to one class of securities means one thing, and when applied to another class something else. The question now is, what does it mean in this case?

The fact which establishes the lien is the issue of bonds by the State to a company, that is to say, the delivery of bonds by the State to a company under the contract of loan. The lien attaches as soon as the delivery is complete, and when there is no obligation on the part of the company to the holders for the payment of the bonds, because the company is itself the holder, and there can be no obligation of payment by itself to itself. But, the delivery of the bonds by the State to, and their acceptance by, a company, created at once an obligation

on the part of the company to pay the loan, or, what is the same thing, pay the bonds to the State. That it was the purpose of the statute to secure the performance of this obligation on the part of the company is shown by the fact, that, from the moment of the delivery of the first bond to the company, and before the bond could be negotiated by a sale or transfer to a third person, a lien was vested in the State by the very act of delivery upon all the property of the company then acquired, or thereafter to be acquired, superior to any other lien or incumbrance which could be created by the company afterwards. This is the express provision of the last paragraph in § 4; and while it is said once in the entire act that the bonds shall constitute the lien, it is repeated again and again that, upon the issue of the bonds, the State shall be invested with a lien, &c. The only place where it is stated that the bonds shall constitute a lien is that in which provision is made for the issue on the completion of the first section of thirty miles, and, before the sentence in which this expression appears is completed, it is declared that the lien is to vest "upon the issuance of the bonds, and by virtue of the same." But when the whole road is completed, and the lien is established on all the property owned by the company as incident to, and necessary for, its business, the language is, "And when the whole of said road shall be completed, the State of Tennessee shall be invested with a lien . . . for the payment of all of said bonds issued to the company as provided in this act, and for the interest accruing on said bonds." This shows unmistakably that the State attached no special importance to the particular phraseology of § 3 with reference to the issue for the first thirty miles of the road. The evident purpose of the whole provision was to vest in the State a lien to secure the obligation which the company assumed in consideration of the State bonds issued to it in aid of works of internal improvement, to be constructed for the benefit of the public. If that obligation was to pay the bonds to the several persons who might become the holders thereof, then the security would run with the bond; but if the obligation was to pay the State for the bonds, the security would enure only to the benefit of the State, and be

subject to the control of the State, without regard to the bond-holders.

The lien was to be "for the payment of all of said bonds issued to the company as provided for in this act, and for the interest accruing on said bonds." It was, as has been seen, to begin as soon as the bonds were put into the hands of the company, for it was then and by that act that the liability of the company under the statute was created. At that time no one but the State could be interested in the security, and at that time clearly the lien operated only as security for the payment of the loan of the bonds. This could be made by a return of the bonds themselves, or in any other way provided in the statute. A return of the bonds to the State would not technically *pay* the bonds, but it would pay the loan, and thus cancel the obligation of the company to the State and discharge the lien. This brings us to the inquiry whether provision was made in the statute for *payment* by the company in some other way than by taking up the bonds from the several h-lders thereof, and if so, to whom and how.

The obligation under the statute is to pay the bonds and the interest accruing thereon. This clearly means payment of the bonds and the interest in the way provided by the statute, if there be any. As the liability of the company to pay at all grows out of the statute, it follows that if a particular mode of payment is provided for in the statute, payment in that mode is all the company can be required to make. Looking then to the statute, we find that provision is made in one part for the payment of interest and the enforcement of that obligation of the company, and in other parts for the payment of principal.

1. As to interest. § 5 makes it the duty of a company to deposit in the Bank of Tennessee, at least fifteen days before coupons for interest on any of the bonds issued to that company fall due, an amount of money sufficient to pay such interest, including exchange and necessary commissions, or satisfactory evidence that it has been paid or provided for. The Bank of Tennessee was established by the act of January 19, 1838, "in the name and for the benefit of the State," and "the faith and credit of the State" were "pledged" for its support.

The State was its only stockholder, and was entitled to all the profits of its business. It was the fiscal agent of the State, and was practically the treasury in which all public moneys were kept. The state treasurer held none of the State funds in his own hands, but deposited them all in the bank, where they were placed to the credit of the "Treasurer of Tennessee," and subject to his checks, drawn according to law, and countersigned by the comptroller. Other accounts connected with the financial business of the State were kept in the books of the bank, headed "Interest on State Bonds," "Interest paid on State Bonds," "Railroad Companies for Interest," and otherwise. The entries made in the books showed the amount which each railroad company paid in for interest, but the payments were all passed to the credit of the State, either in the treasurer's general account, or in the account headed "Interest on State Bonds." The bank paid the interest on all State bonds without reference to the purpose for which they were issued. It had correspondents in New York and Philadelphia through whom such payments were made, and these agents took up the coupons when presented and forwarded them to the bank, by which they were handed over to the proper State officers. The moneys paid in by railroad companies for interest were sent with other moneys of the State to the New York and Philadelphia agents, by whom they were paid out upon coupons, no distinction being made as to the different kinds of bonds. The agents kept no accounts with the companies, and neither they nor the bank knew what bonds had been issued to any particular company. No attempts were made, either by the bank or its agents, to classify or identify coupons, when paid, as being coupons from bonds issued to one company or another.

In the books of the treasurer of State there was an account headed "Bank of Tennessee," the reverse of that kept by the bank in the name of the treasurer. There was also an account headed "Interest on Capitol Bonds," in which was shown the interest paid on bonds issued for the State house. Besides this there was an account headed "Interest on Internal Improvement Bonds," showing the gross amount paid out on such

bonds, but not by whom the money was furnished, nor the numbers or character of the bonds on which the interest was paid. No separate accounts were kept in the treasurer's books with the different railroad companies, and, with the exception of the distinction between capitol and internal improvement bonds on his books, the treasurer paid no attention to the different kinds of bonds, but treated all as equally the obligations of the State. This was the way in which the business was done by all the companies, the bank, and the treasurer of the State, as long as the bank was in operation.

Under these circumstances it is difficult to see how a deposit in the bank by a company of the money to pay interest can be treated otherwise than as, within the meaning of the statute, the payment by the company of the accruing interest on the bonds, which the company had bound itself to make. The deposit was made to enable the State to meet its own obligations. It was not placed, neither by the statute was it required to be placed, to the credit of the company, but of the State. The bank did not take the money for the company, but for the State, and consequently the deposit was accepted and kept as and for State funds. Neither the bank nor the State was bound, either to the companies or to the bondholders, to use the deposits made by a particular company to pay the interest on bonds issued to that company. The bank is nowhere made by the law the agent of the company. It was to take, keep, and pay out according to law, for the State, all moneys deposited or set apart for the liquidation of accruing interest. If the deposits made by the various companies were not enough for that purpose, it was the duty of the comptroller to draw from the treasury, on his own official warrant, a sufficient amount to make up the deficiency. No special provision was made in the statute as to the way in which coupon-holders were to be paid. That was all left to be determined by such regulations as might from time to time be adopted for the government of State officers and State agencies in the payment of State debts. The money when deposited became at once the money of the State, and was in no way thereafter subject to the control of the depositor. When used to pay maturing interest, it was

paid by, and on behalf of, the State, through its own agencies, to redeem its own pledges of faith to the holders of its own obligations. The company performed its whole duty to the State when it deposited in bank, subject to the control of the State, a sufficient amount of money to meet the interest which was to accrue on the State obligations fifteen days thereafter, and the expenses incident to such payment. It is true an option was given the company to pay the interest instead of making the deposit, but this was clearly intended for the convenience of the company, and not because of any obligation the company was supposed to be under to the bondholders. Payment, therefore, by a company, into the bank, of a sufficient amount of money to enable the State to meet its accruing interest, was, and was intended by the legislature to be, not only *a* payment of the interest on the bonds by the company, but *the* payment, and *the only* payment, of interest the lien created by the statute was to secure. To hold otherwise would be to decide that the legislature, while providing for a loan of the bonds of the State to corporations engaged in works of internal improvement, required the corporations to secure by liens on their own property, not only the payment to the State of the interest on the loan, but also the redemption by the State of its own pledges of faith to the future holders of the State bonds that were lent. Certainly no such construction will be given to the statute unless it is imperatively demanded; and when provision is made in express terms for a payment to the State, no second payment of the same debt will be presumed to have been in the contemplation of the parties, in the absence of some positive requirement to the contrary. The lien must be held to be for the security of the payment which is expressly provided for and no other.

But the correctness of this view of the statute is made still more apparent by another important provision of the same § 5, to the effect that if a company failed to deposit the interest at the time required, or furnish the necessary evidence that payment of the interest had been made or otherwise provided for, the governor should appoint a receiver to take possession, and run and manage the railroad of the company until a sufficient

sum was realized from the earnings to discharge such "unpaid interest." The failure of a company to make its deposit did not relieve the State from the obligation to keep its faith and pay the interest to its bondholders at maturity. Consequently, the "unpaid interest" here referred to must have been the interest for which a deposit had not been made, and this clearly implies that the deposit was the payment which the lien was intended to secure. Interest on the lent bonds deposited for was paid, within the meaning of the statute, and that not deposited for was unpaid. A receiver was to be appointed, and possession taken, only when there was default on the part of the company in making its deposit. Non-payment of interest by the State, after the deposit, created no such default. As the statutory remedy for the enforcement of the statutory lien must be presumed to have been intended to be commensurate with the lien itself, and this remedy was confined to cases of default in making deposits, there cannot be a doubt that it was the understanding of the legislature that a deposit for interest was a payment of interest on the bonds, so far as the company was concerned, and released the company as well as its property from all further liability to the State, or to any one else, which had been assumed for interest. The pledge of State faith for the performance of all State obligations under the act constituted the only security of the bondholders for the prompt payment of the interest due to them. The liens on the property of the companies stood only as security for the payment of the interest on the bonds to the State.

2. As to the principal. This is provided for in three ways: 1, by the establishment of a sinking fund; 2, by foreclosure if the company failed to pay the bonds at maturity; and 3, by foreclosure and proceedings against guilty stockholders, before maturity, if an issue of the bonds was obtained by fraud, or contrary to the provision of the act.

The sinking fund was first established by § 7 of the original act, which required each company, at the end of five years after the completion of its road, to set apart annually one per centum of the amount of bonds issued to such company, and use it in the purchase of bonds of the State of Tennessee, which

bonds the company was to *pay* into the treasury of the State, taking a receipt therefor, and, as between the State and the company, the bonds so *paid in* were to be a credit on the bonds issued. The bonds paid in, and the accruing interest thereon, were to be held and used by the State as a sinking fund for the payment of the bonds issued to the company. If in this way a company re-purchased and paid in any of the bonds issued to it, they were to be cancelled. Should a company fail to comply with these provisions, it was to be proceeded against, as in § 5, for a failure to pay, or deposit for, interest. This provision was changed by the act of 1856 so as to increase the annual payments to two per cent. on the amount of the issue of bonds, and to require them to be made in money, and to begin at the end of five years after the dates of the several issues. The money, when paid into the treasury, was to be invested by a board of sinking fund commissioners in bonds of the State, and all accruing interest was to be reinvested in like securities. If a company failed to comply with these provisions of the amending act, it was to be proceeded against as for a default in the payment of the bonds at maturity under § 6 of the act of 1852. Under the statutes of 1852 and 1856 the companies were not released from their obligations to provide semi-annually for the payment of the accruing interest on the entire issue of bonds. That was still to be kept up, notwithstanding the debt of the company to the State had been reduced by the annual payments required by § 7.

By the act of 1860 other changes were made, which increased the amount of annual payments to two and one-half per cent. on the original issues, and allowed them to be made in money, or in bonds of a like character with those issued to the company, at their face value. If paid in money, the sinking fund commissioners were to invest it immediately in bonds of a like character with those issued to the company, and have them cancelled. By this act also the company was released from the obligation under the act of 1852 to provide for the interest on the whole issue of bonds, and required to deposit only for that which would accrue on the amount of bonds "unpaid" at the time the interest fell due. What was here

meant by the word "unpaid" is shown by §§ 1, 2, and 9 of the act, which provide that all sinking fund payments, in money or bonds, made before January 1, 1860, with the accruing interest thereon to that date, "shall be passed directly to the credit of the party having so paid the same, and be a release to said party for that amount of the debt due by them to the State of Tennessee." The Comptroller of the State was also required to open and keep a regular account with each company, charging it with the total amount of bonds originally issued to such company, and crediting it with the amount of the sinking fund paid. It was also made his duty to furnish to the Treasurer of State a statement of the amount due by each company on the first days of June and December in every year, "that he may know how much interest each company has to pay," that is, deposit, "as now provided by law, on the amount of bonds unpaid at the time said interest falls due, and not on the original amount issued to . . . said company." Act of 1860, §§ 8, 9.

While it is true that neither the act of 1856 nor that of 1860 can change any contracts the companies may have made with bondholders under the act of 1852 before their passage, they may be resorted to in aid of construction to show what had been the legislative understanding, for a long series of years, of the meaning of the words "payment of said bonds and the accruing interest thereon," as used in the original act.

The provision of § 7 is that the company shall *pay* the bonds purchased into the State treasury, and that for the purchased bonds so *paid in* a receipt shall be given and a credit allowed, as between the State and the company, on the bonds issued. Thus the company was required to make *a* payment to the State, and for *this* payment the State was to give a credit on the bonds. This clearly implies that the loan of the bonds was to create a debt on the bonds by the company to the State, and that this debt was to be discharged *pro tanto* on the payment annually into the State treasury of the amount required by the sinking fund section. If there were nothing else in the statute, no one would doubt that the payment of the bonds which the company was required to make was a pay-

ment to the State for the bonds at the times and in the manner provided.

It is contended, however, that, as the credit to be secured by these payments was only "as between the State and said company," the liability of the company to the bondholders is not affected by what may be done by and with the State. This would be true if there were any such liability to the bondholders, but the very point to which our inquiries are now directed is as to whether or not that liability exists. The phrase relied on and quoted above is undoubtedly suggestive of some other liability of the company on the bonds than one to the State, but it does not of itself create such a liability. If it exists at all, it must be by virtue of some other provision of the statute. As has already been seen, there is but one debt, and whatever pays that debt, cancels the obligations of the company upon the bonds. Whenever, therefore, it appears that payment of the bonds must be made to one, the idea of a debt on the bonds to another is excluded. Here a payment to the State is absolutely required. This obligation to pay is express, and has not been left to implication. The provision is that the sinking-fund bonds must be bought and paid in at the appointed times and to the prescribed amount. If this is not done, the payment is to be enforced by putting the railroad of the company into the hands of a receiver, and running and managing it until the requisite amount of money is realized by the State from the earnings. Under the act of 1856 the payments were required to be made in money, and in case of default proceedings for foreclosure and sale were to be instituted to collect the amount to be paid, as in cases of non-payment of bonds at maturity. If the statutes of 1852 and 1856 stood alone, it would be clear to our minds that payments into the sinking fund were to be treated as a release *pro tanto* of all the liability of the company on, or on account of, the bonds. But the act of 1860 shows, beyond all question, that such was the legislative understanding at that time of the operation of this provision of the original act. It is there declared in positive language that by the loan of the bonds a debt was incurred by the company to the State, and

that payments to the sinking fund should release and discharge the companies *pro tanto* from their liability on that debt.

It is argued, however, that as these payments under all the statutes were to be held and used by the State as a sinking fund for the ultimate redemption of the issued bonds themselves from the several holders thereof, the obligation of the company to pay the bonds would not be discharged in that way; and some remarks of this court in the *Sinking Fund Cases*, 99 U. S. 700, 725, are cited as authority to that effect. The decision in that case was that the contributions to the sinking fund then under consideration did not pay the debts of the several companies by which the contributions were made, because that fund was established, not to secure the payment of the bonds of the United States which had been lent to the companies, but the repayment to the United States, in the manner and at the time required by law, of "the amount of said bonds so issued and delivered to said company, together with the interest thereon which shall have been paid by the United States." But here the sinking fund is to be held and used by the State, not to discharge the debt of the company to the State, but that of the State to its bondholders. It was established not to secure the State, but to enable the State to pay its own debts at maturity. In this way all payments made by the companies to the State on account of the principal of the bonds were set apart and laid by under investment, so that at the appointed time they might be used by the State to redeem its own obligations. The fund in the treasury belonged to the State, and was not in any manner subject to the control of the company, or to be used to pay its debt. That debt was discharged by the payments which under the law were put into the fund. All payments out of the sinking fund were to be made by the State on its own debts and not on the debt of the company. A sinking fund may be, and generally is, intended as a cumulative security for the payment of the debt with which it is connected. In this case the debt to which it belongs is that of the State, and not that of the company, which was paid so as to furnish the State with the means to create such a fund.

Reference was made in the argument to the way in which, under the act of 1852, and perhaps that of 1856, the sinking fund was to be kept and invested, and it was urged that the fund must have been intended as security for the payment of the bonds to the bondholders by the company, because if a bond issued to a particular company was bought by that company and paid into the fund, it was cancelled, while all other bonds were kept alive to be held and used by the State to take up at maturity the bonds issued to the company which had not been so paid in. The argument seems to be, that, as the purchase of a bond issued to a particular company, and its payment into the fund by that company, would of itself be a payment of that bond by the company both to the State and the holder, the special provision for the cancellation of such a bond, while others are to be kept alive, is indicative of a purpose not to cancel the obligation of the company under the statute until the company had not only provided the State with the means to take up all the other outstanding bonds, but until the State had itself performed its own obligations and actually taken them up. This is undoubtedly a circumstance to be considered in determining what the payment was which the State intended the company should make, and for the security of which the lien was created; but it is not to our minds enough to overcome the many provisions found in the other parts of the statute, which so clearly show that there was to be but one creditor of the company on account of the contemplated loans of the bonds, and that creditor the State. Whatever, therefore, satisfies that creditor, under the law, satisfies the debt. We cannot accede to the proposition, so much relied on by the counsel for the bondholders, that on putting out the bonds the company occupied towards the bondholder the relation of principal debtor, and the State that of surety only, until the company made the prescribed payments to the State, and that after these payments were made the relations of the parties changed, so that thereafter the State was principal and the company a surety only. The debt of the company, whatever it was, continued the same in its relation to all the parties from the time it was created until it was paid.

There is nothing in the statute which contemplates any change in the obligations of the parties toward each other. There may have been no good reason for keeping some of the State securities paid into the fund alive, and directing that others should be cancelled, inasmuch as all were to represent State debts, for which the State was equally bound; but that was the will of the legislature, and it was consequently so enacted. Afterward this policy was changed, and all State bonds, of whatever character, were cancelled by mutilation as soon as they were paid in, or bought for the sinking fund. Act of 1860. In this way all danger of a misappropriation of securities in the sinking fund was avoided. As bonds issued to railroad companies under the act could alone be used for the investment of the fund under this act, their cancellation did not affect the liability of the several companies thereon to the State, because that was to continue until payment was made to the State by the company to which it was issued. Payment by the State to the bondholder did not discharge the liability of the company on the bond so paid.

The provision for a foreclosure in case of a failure of the company to pay at maturity the bonds issued to it is found in § 6, which makes it the duty of the governor, when such a default occurs, to notify the attorney general, who must thereupon file a bill against the company in the name of the State of Tennessee in the Chancery or Circuit Court of the proper county. Upon the filing of this bill, the court is authorized to make such judicial orders, including the appointment of a receiver, and a sale of the road and all the property of the company, as may be necessary and proper to secure the payment of the bonds, with the interest thereon, and to indemnify the State against loss by their issue. We see no special significance, so far as the present question is concerned, in the direction of the attorney general to file the bill in the name of the State. Without such a direction there might be doubt whether the suit to be instituted should be in the name of the attorney general or of the State. It was probably unimportant whether the one form or the other was adopted, for, in any event, the object would be to enforce the obligation of the

company and collect the money which was due. The legislature, however, saw fit to avoid all doubt on this subject, and to direct that the proceeding should be in the name of the State. Taken by itself, therefore, this section adds little, if anything, to the other evidence in the statute as to who the creditor was for whose benefit the money was to be collected. The proceeds of the foreclosure were to be used to pay the bonds, within the meaning of the statute, and also to indemnify the State against loss. To whom the payment was to be made must be determined by looking elsewhere. There is nothing to show that the author of the statute had the security of the bondholder in his mind when drafting this section, any more than when drafting the others. Payment of the bonds meant in this section what it did in the others; no more, no less. It is true that here payment of the bonds and indemnity to the State are both spoken of, but payment of the bonds through a proceeding for foreclosure might not be enough to indemnify the State against all loss incident to the loan of the bonds. There might be expenses incurred in the foreclosure which would not be reimbursed by a simple payment of the amount of the bonds. Indemnity of this and a like character was evidently the purpose of this particular provision in the section. It was, in the language of counsel for the bondholders, to secure the State against "a money loss . . . in the way of counsel charges, or receiver's charges, or betterment expenses, or debts not included in the words 'to secure the payment of said bonds.'"

Proceedings for foreclosure before the maturity of the bonds, and the liability of guilty stockholders in case of issues of bonds obtained by fraud, or contrary to the provisions of the act, are provided for in § 13. This section makes it the duty of the governor, as soon as he receives reliable information of such fraud or irregularity, to notify the attorney-general, who must at once institute a suit in the Circuit or Chancery Court of the proper county. In such a suit the court is given authority to order a sale of the road, and the property and assets of the company, or so much thereof as may be necessary. When such a sale is made, the proceeds are to be paid into the

treasury and invested by the comptroller in "the same stocks, creating a sinking fund, as provided for in the seventh section." The guilty company is also made to forfeit all its rights and privileges under the act, and its guilty stockholders are made individually liable "for the payment of the bonds so fraudulently obtained by such company, and for all other losses that may fall upon the State in consequence of the commission of any other fraud by such company." This is manifestly for the benefit of the State alone. The bondholder can have no special interest in such a proceeding. His rights are in no way affected by the fraud of the company in obtaining the bond he owns. The State is his debtor, and he has no right to call for the money owing to him until the maturity of his bond, which will not be until thirty or may be forty years after the commission of the fraud which gave the State the right to call at once on the company and its implicated stockholders for the payment of the bond he holds. It will hardly be contended that it was intended to make the stockholder individually liable to the bondholder, yet his liability is for "the payment of the bonds" just as is that of the company. If in his case payment of the bonds does not mean payment to the bondholder, it does not in that of the company. The language of the act is the same in both cases, and there is nothing whatever to show that as to one it meant one thing, and as to the other something else. The evident purpose of this section was to give the State the power, immediately on the discovery of a fraud, to demand of the company "payment of the bonds," that is, payment of an amount of money equal to that called for by the bonds, and a remedy at once against the company and its implicated stockholders for the enforcement of such a payment in case it was not voluntarily made. The money when collected was to be set apart and invested "as a sinking fund for the payment of the bonds" by the State.

By § 14 it was made the duty of the governor to appoint an agent for the State, to attend all sales, made either under § 6 or § 13, to protect the interest of the State, and, if necessary for that purpose, to buy the road or property in the name of the State. If bought, it was to be put in the hands of a

receiver to manage and run in the way provided in § 5, until the next meeting of the general assembly. The receiver was to settle his accounts with the comptroller semi-annually, but no directions were given in relation to the manner in which the net earnings were to be used in case of a sale under § 6. He was to take possession of "the said road and property and use the same as provided for in the fifth section," and, on the set- tlement of his accounts with the comptroller, the balances remaining in his hands would necessarily go into the treasury, there to be dealt with as the general assembly should direct. If a purchase was made by the State under § 13, the presump- tion would be that the earnings must go into the sinking fund, as such was the provision made for the proceeds of a sale to another purchaser, but all that would necessarily be under the control of the general assembly when it met.

Having thus gone over the other sections, we are prepared to consider § 12 in its bearing on the question which is now under discussion. This section reserves to the State in express terms the right to enact " all such laws as may be deemed necessary to protect the interest of the State, and to secure the State against all loss in consequence of the issuance of bonds under the pro- visions of this act, but in such manner as not to impair the vested rights of the stockholders of the companies." This reser- vation includes, and was undoubtedly intended to include, full power in the State, as against every one except stockholders, to do whatever might be deemed necessary by the legislature, with the lien reserved for the security of the obligations assumed by the companies. Nothing is said about bond- holders. It will, of course, be conceded that if bondholders actually had any vested right or interest as against the State in the security created by the statute, nothing could be done under this section by the State to impair that right. But the same was probably true of stockholders, and the special care taken to preserve the rights of stockholders, without referring to bondholders at all, raises a strong presumption that it was never intended to vest in them any right which would interfere in the remotest degree with the free exercise of all the power of the State to deal with the borrowing companies in reference to·

the bonds and the security created therefor, just as might, under any circumstances that should arise, be deemed most for the interest of the State and the companies, they being the only parties to the contract of the companies that were to be at all interested in what was to be done. As has been seen, the bonds to be issued were on their face to bind only the State. At that time repudiation of State faith was not thought of. No purchaser of State bonds ever asked whether anything else than the faith of a State was pledged for their payment promptly at maturity. Repudiation was looked upon as dishonorable, and something that would never occur. Security to the State against loss by the loan of its bonds which were provided for must, therefore, be presumed to have been the sole purpose of the liens which were to be created on the issue of the bonds. Bondholders were never thought of in this connection, for they had the security of the faith of the State, and could not have been supposed to look for anything else. Hence, this reservation of power by the State was made broad enough to allow the State to deal with the securities which were taken from the companies at its own discretion, and in any way that might be deemed just. No such power could be exercised if the bondholders held an interest in the securities adverse to the State. Under these circumstances this section is be looked upon as excluding any such possible intent, and operating as a standing notice to all who might, from time to time, become the holders of any of the lent bonds, that the payment of the bonds, and the interest thereon, which the several companies bound themselves for, was to be made to the State, and not to them, and that the security which was taken by the State was for the performance of this obligation, and might be dealt with by the State in any manner its own legislature should direct or provide. This reservation of power is entirely inconsistent with the idea of a debt from the company to the bondholders on account of the bonds; and, if there could have been any doubt on this subject without § 12, there certainly is none with it.

. This disposes of all the cases; for the State, in the exercise of its legislative discretion, has released each of the companies

whose property is involved in these suits from all its obligations growing out of the original loans, and has cancelled the liens created for their security. The companies have either voluntarily paid their debts to the satisfaction of the State, or the State has foreclosed the lien which was reserved, and sold the property, free of that incumbrance, either to the present defendants, or to those under whom they claim.

Some reliance was placed, in the argument for the bondholders, upon the legislative history of the passage of the act of 1852, which showed an offer and rejection of certain proposed amendments, and also upon the construction which had been put on the act by certain State officers of high authority in the administration of the public affairs, but we have deemed it unnecessary to add to the length of this opinion by particular reference to that branch of the argument, because, as we think, the statute contains within itself unmistakable evidence of its meaning. The same is true of the reference which has been made to other statutes of Tennessee, and to statutes of the States and of the United States upon the same general subject. This statute differs in its phraseology from some, and perhaps all, of the others, but its own language furnishes all the aid which is required for its true interpretation.

*The decree in each of the cases is affirmed.*

Mr. Justice HARLAN, dissenting.

I am of opinion, that while the object of the statutes in question was to protect the State against liability, they were, also, designed to create a lien for the payment of the bonds themselves, by whomsoever held. That lien, so far as the holders of bonds were concerned, could not be discharged, except by payment of the interest and principal, according to the terms of the bonds, and in the mode prescribed by the statute under which they were issued. For these reasons, I am compelled to withhold my assent to the opinion and judgment.

Mr. Justice MATTHEWS and Mr. Justice BLATCHFORD took no part in these decisions.