HANNA et al. v. STATE TRUST CO. et al.

(Circuit Court of Appeals, Eighth Circuit. September 23, 1895.)

No. 593.

CORPORATIONS—RECEIVER'S CERTIFICATES.

The L. Co. made two mortgages on separate tracts of land owned by it, to secure notes and bonds; and the W. Co. made a mortgage on land owned by it, to secure bonds. The two corporations were then consolidated to form the D. Co., which became the owner of all the lands, subject to these mortgages, and made another mortgage, subordinate to them, on all the lands, to secure a new issue of bonds. The D. Co. was engaged in the business of irrigating, improving, and colonizing arid lands, and, in such business, made certain contracts with purchasers of land, to carry on improvement and cultivation for periods of years. The D. Co. having failed to pay the interest on its bonds, the second mortgagee began a suit to foreclose its mortgage, making the prior mortgagees parties; and in this suit a receiver was appointed, who applied for leave to issue receiver's certificates, to be a prior lien on the lands, for the purpose of raising money to pay taxes, to carry out the contracts with purchasers, and to continue the business of the company. Held, that certificates might be issued to pay taxes, but that the court could not, against the objection of the first

mortgagees, displace their liens by the issue of certificates for the other purposes suggested; the business of the corporation being merely private, and affected with no public use.

Appeal from the Circuit Court of the United States for the District of Colorado.

On the 1st day of November, 1889, the Denver-Arapahoe Land Company, a Colorado corporation, executed to the appellant John R. Hanna its trust deed on 11,320 acres of land in Arapahoe and Douglas counties, Colo., to secure to the appellant Rufus Clark the payment of its promissory notes aggregating the sum of $97,000. On the same day the same corporation executed to the Mercantile Trust Company of New York, as trustee, a deed of trust on 4,480 acres of land in Arapahoe county, Colo., to secure an issue of its first mortgage bonds amounting to $140,000. On the 1st day of March, 1890, the Denver Water-Storage Company, a Colorado corporation, executed to the State Trust Company of New York, as trustee, a deed of trust on about 1,100 acres of land in Douglas county, Colo., together with the Castlewood dam and reservoir, irrigating canals, ditches, etc., to secure the payment of its first mortgage bonds amounting to the sum of $300,000. Each of these deeds of trust covers different properties, and is the first and valid lien upon the property covered by it. On or about the 1st day of May, 1891, the Denver Land & Water-Storage Company was organized, pursuant to the laws of Colorado, by the consolidation of the Denver-Arapahoe Land Company and the Denver Water-Storage Company, and by virtue of such consolidation acquired, subject to the deeds of trust above described, all of the property covered by or embraced therein. Immediately after its organization the Denver Land & Water-Storage Company executed a deed of trust upon the entire property acquired by the consolidation mentioned, subject to the several deeds of trust executed by the constituent companies, and above set forth, to the State Trust Company of New York, as trustee, to secure an issue of its general or consolidated mortgage bonds to the amount of $800,000. On the 4th day of June, 1894, the State Trust Company of New York, as trustee in the consolidated mortgage last above mentioned, filed its bill of complaint in the circuit court of the United States for the district of Colorado against the Denver Land & Water-Storage Company, alleging that it had made default, and failed to pay the taxes on its lands or interest upon its bonds, and that it was insolvent, and prayed for the foreclosure of its mortgage and the appointment of a receiver. This bill admitted the priority of the underlying deeds of trust executed by the constituent companies, and that any relief granted in the suit, by foreclosure or otherwise, must be subject to the rights and equities existing under the prior mortgages. On the day the bill was filed the Denver Land & Water-Storage Company appeared and answered; admitting its insolvency, and confessing all the allegations to the bill. The court thereupon appointed a receiver. On the 24th of July, 1894, the State Trust Company filed its amended and supplemental bill of complaint, to which the Mercantile Trust Company of New York, and the appellants, John R. Hanna and Rufus Clark, were made defendants. This amended bill prayed relief as follows: That the said Mercantile Trust Company, John R. Hanna, and Rufus Clark might be brought in as defendants in the action, and required to set up their respective rights upon the real estate covered by the deeds of trust executed by the Denver-Arapahoe Land Company; that the respective rights of the trustees under the several mortgages or deeds of trust might be judicially ascertained and determined by the court; that the properties covered by the respective deeds of trust might be marshaled, and judicially ascertained and adjusted; that the amounts due upon the notes and bonds issued under the several deeds of trust might be adjudicated and determined; that the said deeds of trust might be foreclosed; that the receiver theretofore appointed in the action might be continued as receiver of all the property covered by each and all of said deeds of trust; that the said John R. Hanna, Rufus Clark, and the Mercantile Trust Company, and the holders of any of the notes, bonds, or securities issued under said deeds of trust, might be

enjoined and restrained from commencing any action or proceeding in the circuit court of the United States for Colorado, or any other court, for the foreclosure of the said deeds of trust, and from enforcing their said notes and bonds, or for the collection thereof, against the Denver. Land & Water-Storage Company, or its property and effects, except in this action.

On the 16th day of August, 1894, a special master appointed in the cause made a report, from which it appears that the company was endeavoring to carry on a colonization business, and was engaged in selling small tracts of land, for fruit raising and garden purposes, to settlers, or those who proposed to become settlers, or colonists; that in many cases the company sold these tracts of land (usually 10 acres), under executory contracts, for small amounts of cash down, and deferred payments extending over a period of five years, when the various purchasers were to receive the deeds. The company agreed to plant these tracts with fruit trees, and cultivate and care for them during the five years. On the 16th of August the receiver filed his petition, stating, substantially, that the property of the Denver Land & Water-Storage Company consists of 17,000 acres of land in the counties of Arapahoe and Douglas, Colo., and an extensive dam or reservoir, known as the "Castlewood Dam," and a system of canals and irrigating ditches connected therewith, and a large number of land-purchase contracts and land-purchase notes, referred to in the report of the special master; that the original plan of the Denver Land & Water-Storage Company contemplated the colonization of these lands; the amount of the land-purchase contracts and notes, as shown by the report of the special master; the agreements made by the Denver Land & Water-Storage Company to plant and cultivate the lands, already referred to, and that in consideration thereof the various purchasers have made large payments, and have a right, in justice and equity, to demand performance of the contracts of the Denver Land & Water-Storage Company, and that otherwise the fruit trees upon the tracts sold under the planting and cultivation contracts will die, and the payments made by the purchasers will be absolutely lost; and that, moreover, it is of vital importance to the company that it should collect the balance due upon the land-sale notes and contracts mentioned, which collection is entirely dependent upon the keeping up of the tracts of land, and the performance by the company of the contracts with the purchasers aforesaid. The petition then presents a number of reasons and arguments why, in the judgment of the receiver, certificates should be issued, and calls attention to the default in taxes upon the company's lands, alleged to amount to about $4,000. The particulars of the three underlying mortgages and the consolidated mortgage are then given, and the receiver calls the court's attention to the opportunity which presents itself for engaging in the colonization of the company's barren lands, if he is authorized to issue certificates of indebtedness to raise funds with which to properly present the merits and advantages of the Denver Land & Water-Storage Company's property. On the 15th day of September, 1894, the court made an order, upon the receiver's petition, which authorized the issue of receiver's certificates to pay taxes due upon the lands, and to redeem the same from tax sales, and making such certificates a first and paramount lien upon the property upon which the taxes were paid. The order also contained this provision: "(5) It is further ordered, adjudged, and decreed that in addition to the amounts which may be necessary to pay the taxes now in arrears upon the property set forth and described in paragraphs 2, 3, and 4 of this order, the receiver shall have, and is hereby granted, authority to borrow such additional sum of money as shall, together with said amounts for taxes, amount in the aggregate to a sum not exceeding $10,000, and to issue therefor his certificates of indebtedness, which said certificates of indebtedness shall be first and paramount liens upon all the property, rights, and franchises now owned or controlled by the said the Denver Land & Water-Storage Company, defendant herein, wheresoever situated, and subject to the jurisdiction of this court. And said additional sums of money shall be used and applied by said receiver for the purpose of preserving the property of the Denver Land & Water-Storage Company in his possession and custody, and carrying out and maintaining the contracts of the company now in existence, under and by

which the company has heretofore sold tracts of land to various parties, which said contracts are referred to in the report of said receiver, and for such other purposes as are set out in said petition, with references to the maintenance, preservation, and protection of the property of the company, or as the court may from time to time direct." From this order, John R. Hanna, trustee in the deed of trust dated November 1, 1889, and Rufus Clark, the beneficiary named therein, and the holder of a large amount of the bonds secured by the mortgage to the Mercantile Trust Company, appealed to this court.

John S. Macbeth (Enos Miles, on the brief), for appellants.

A. C. Campbell (A. E. Pattison and Henry W. Hobson, on the brief), for appellees.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

CALDWELL, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The precise question in this case is whether a court of chancery which has appointed a receiver for an insolvent private corporation in a foreclosure suit brought by a second mortgagee may, against the objection of the first mortgagee, authorize its receiver to issue receiver's certificates to raise money to carry on the business of the insolvent corporation and to improve its lands, and make such certificates a first and paramount lien upon the lands covered by the first mortgage. So far as we are advised, the power to do this has been denied in every case in which the question has arisen. One of the first cases in which the question arose was Raht v. Attrill, 106 N. Y. 423, 13 N. E. 282. In that case a hotel company mortgaged its property to raise funds to build a hotel. Before the completion of the hotel the corporation became insolvent, and upon the application of its principal stockholder a receiver was appointed; and upon an application and showing that the wages of the men who worked on the hotel building were unpaid, and that they threatened, unless paid, to burn the building, the court made an order authorizing the receiver to issue certificates, which were declared to be a lien prior to the trust mortgage, to raise funds to pay the wages due the laborers. A reference reported that, if the money had not been raised to pay the wages due the men, the hotel and other property of the corporation "would, in all probability, have been destroyed or seriously injured." In the progress of the case the mortgagee denied that the court had authority or power to set aside the prior lien of the mortgage and make the receiver's certificates, issued under the circumstances mentioned, a first and prior lien upon the property. The court delivered an exhaustive opinion, covering every aspect of the question. We quote some of its utterances. The court said:

"The lien of the mortgage attaches, not only to the land in the condition in which it was at the time of the execution of the mortgage, but as changed or improved by accretions or by labor expended upon it while the mortgage is in existence. Creditors having debts created for money, labor, or materials used in improving the mortgaged property acquire on that account no legal or equitable claim to displace or subordinate the lien of the mortgage, for their protection. * * * The act of the court in taking charge of property through a receiver is attended with certain necessary expenses of its care and custody; and it has become the settled rule that expenses of reali-

zation, and also certain expenses which are called 'expenses of preservation,' may be incurred, under the order of the court, on the credit of the property; and it follows, from necessity, in order to the effectual administration of the trust assumed by the court, that these expenses should· be paid out of the income, or,· when necessary, out of the corpus, of the property, before distribution, or before the court passes over the property to those adjudged to be entitled. * * * It would be difficult to define, by a rule applicable in every case, what are expenses of preservation which may be incurred by a receiver by authority of the court. It was said by James, L. J., in Re Regent's Canal Iron-Works Co., 3 Ch. Div. 411, 427, that 'the only costs for the preservation of the property would be such things as the repairing of the property, paying rates and taxes which would be necessary to prevent any forfeiture, or putting a person in to take care of the property.' Whereever the true limit is, we think it does not include the expenditure authorized by the order of August 17th, and that such an expenditure is, and ought to be, excluded from the definition. There must be something approaching a demonstrable necessity, to justify such an infringement of the rights of the mortgagees as was attempted in this case."

After referring to the cases in which the receivers of insolvent railroad corporations have been authorized to issue certificates which were declared to be a first lien on the property of the corporations, the court said:

"It cannot be successfully denied that the decisions in these cases vest in the courts a very broad and comprehensive jurisdiction over insolvent railroad corporations and their property. It will be found, on examining these cases, that the jurisdiction asserted by the court therein is largely based upon the public character of railroad corporations, the public interest in their continued and successful operation, the peculiar character and terms of railroad mortgages, and upon other special grounds, not applicable to ordinary private corporations. * * * These cases furnish, we think, no authority for upholding the order of August 17th, or for subverting the priority of lien which, according to the general rules of law, the bondholders acquired through the trust mortgage on the property of the company. It would be unwise, we think, to extend the power of the court in dealing with property in the hands of receivers to the practical subversion or destruction of vested interests, as would be the case in this instance if the order of August 17th should be sustained. It is best for all that the integrity of contracts should be strictly guarded and maintained, and that a rigid, rather than a liberal, construction of the power of the court to subject property in the hands of receivers to charges, to the prejudice of creditors, should be adopted."

We concur in the doctrine expressed in this case. See, to the same effect, Farmers' Loan & Trust Co. v. Grape Creek Coal Co., 50 Fed. 481; Laughlin v. Rolling-Stock Co., 64 Fed. 25; Fidelity Ins., Trust & Safe-Deposit Co. v. Roanoke Iron Co., 68 Fed. 623; Snively v. Coal Co., 69 Fed. 204; and Hooper v. Trust Co. (Md.) 32 Atl. 505, 513.

The contention of the appellees is that the order made by·the circuit court finds sanction in the cases of Wallace v. Loomis, 97 U. S. 146; Fosdick v. Schall, 99 U. S. 235; Barton v. Barbour, 104 U. S. 126; Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140; Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295,—and other later cases of like character, in which receivers of insolvent railroad corporations were authorized to issue receivers' certificates for various purposes, which were made a first and paramount lien on the property of the insolvent railroad company.· But the doctrine of these cases has no application to this case. They rest on the peculiar ·character of railroad

property and of a railroad corporation. The distinction between railroad corporations, which are of a quasi public character, and purely private corporations, has been often pointed out, and need not be repeated here. It is enough to say that the supreme court itself has said that the doctrine of the cases cited has only been applied in railroad cases. In Wood v. Safe-Deposit Co., 128 U. S. 416, 9 Sup. Ct. 131, the court said:

"The doctrine of Fosdick v. Schall has never yet been applied in any case except that of a railroad. The case lays great emphasis upon the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern. We do not undertake to decide the question here, but only point it out."

The bill in this case is one to foreclose a second mortgage. To such a bill the prior mortgagees are not even necessary parties. Jerome v. McCarter, 94 U. S. 734. The validity and priority of the liens of the mortgages under which the appellants claimed is distinctly admitted in the original and amended bills. The purpose of filing the amended bill making the prior mortgagees defendants seems to have been to enjoin them from foreclosing their mortgages, and subject the lands covered by their mortgages to a prior lien for money borrowed to carry on the business of the corporation and improve its lands. It prays that the receiver may be empowered to manage and operate the property of the insolvent corporation, which consists in irrigating, improving, and colonizing, or settling, arid lands; and, to the end that the receiver may not be interfered with in the conduct of the business, it prays that the holders of all mortgages prior to the complainants' may be enjoined from foreclosing the same. The amended bill would seem to be founded on the theory that a private corporation conducting any kind of business may, when it becomes insolvent, obtain immunity from the compulsory payment of its debts by procuring a junior mortgagee, or some other creditor, to file a bill alleging the insolvency of the corporation, and praying for the appointment of a receiver with authority to manage and conduct its business. Upon the filing of such a bill, it is supposed to be competent for the court, in addition to appointing a receiver to carry on the business of the corporation, to enjoin its creditors, including the holders of the prior liens on its property, from collecting their debts by due course of law, and to continue such injunction in force so long as the court, in its discretion, sees fit to carry on the business of the insolvent corporation. When a receiver is appointed under such a bill, he usually makes haste, as the receiver did in this case, to assure the court that, if he only had some capital to start on, he could greatly benefit the estate by carrying on the business that bankrupted the corporation. In this case, the company being insolvent, and its property mortgaged for more than it was worth, there was no way of raising money to set the receiver up in business, except by the court giving its obligations, in the form of receiver's certificates, and making them a paramount lien on all the property of the corporation, by displacing the appellants' prior liens thereon. As commonly happens in cases of this character, the receiver, the insolvent corporation,

and the junior mortgagee united in urging the court to arm its receiver with the desired powers. They ran no risk in so doing. The corporation was insolvent, and a foreclosure of the prior mortgage would leave the junior mortgagee without any security; so that it had nothing to lose, and everything to gain, in experiments to enhance the value of the mortgaged property, so long as the cost of those experiments was made a prior lien thereon. The effect of the proceeding was to burden the prior mortgagee with the whole cost of the expenditures and experiments made for the betterment of the property on the petition, and for the benefit of the insolvent corporation and the junior mortgagee. The representation is always made, in such cases, that the receiver can carry on the business much more successfully than was done by the insolvent corporation. This commonly proves to be an error. Raht v. Attrill, 106 N. Y. 430, 13 N. E. 282. But, if it were true, it would afford no ground of equitable jurisdiction, for it is not a function of a court of equity to carry on the business of private corporations, whether solvent or insolvent. It is obvious that if the holders of the first mortgages and the other creditors of the insolvent corporation were allowed to proceed, in the customary and lawful mode, to collect their debts, it would put an end to the business of the receiver, and they are therefore enjoined from foreclosing their mortgages or collecting their debts. The chancery court thus assumes, in effect, all the powers and jurisdiction of a court of bankruptcy or insolvency, but without any bankrupt or insolvent law to guide or direct it in the administration of the estate. Its only guide is that varying and unknown quantity called "judicial discretion." The powers claimed for a court of equity in such cases are, indeed, much greater than a court of bankruptcy can exercise. There never was a bankrupt court, under any bankrupt act, authorized, at its discretion, to displace or nullify valid liens on the bankrupt's property, or itself to create liens paramount thereto. The rights of the citizen, lawfully acquired by contract, are under the protection of the constitution of the United States, and, like the absolute rights of the citizen, are not dependent for their existence or continuance upon the discretion of any court whatever. Constitutional rights and obligations are no more dependent on the discretion of the chancellor than they are on the discretion of the legislature. "Rights," says the supreme court of the United States, "under our system of law and procedure, do not rest in the discretionary authority of any officer, judicial or otherwise." In re Parker, 131 U. S. 221, 9 Sup. Ct. 708. If junior lien creditors of an insolvent private corporation could do what has been attempted in this case, every private corporation operating a sawmill, gristmill, mine, factory, hotel, elevator, irrigating ditches, or carrying on any other business pursuit, would speedily seek the protection of a chancery court, and those courts would soon be conducting the business of all the insolvent private corporations in the country. If it were once settled that a chancery court, through a receiver appointed on the petition of a junior mortgagee, could carry on the business of such insolvent corporations at the risk and expense of those holding the first or prior liens on the property of the corporation, such liens would have

little or no value. It is no part of the duty of a court of equity to conduct the business of insolvent private corporations, any more than it is to carry on the business of insolvent natural persons. If it may take under its control the property of an insolvent private corporation, and authorize a receiver to carry on its business, and make the debts incurred by the receiver in so doing paramount liens on all the property of the corporation, and enjoin its creditors in the meantime from collecting their debts, it is not perceived why it may not proceed in the same way with the estate of an insolvent natural person.

Without pursuing the subject further, we refer to what is said, and to the cases cited, in Scott v. Trust Co., 69 Fed. 17. The order appealed from is void, whether the suit in which it was made is treated as one to foreclose a second mortgage, or as a bill in equity to administer the estate of an insolvent corporation. It was open to the complainant to take and execute a decree foreclosing its second mortgage, and it is good practice in such cases to require this to be done, on pain of dismissing the bill. And if the complainant desired that money be spent, beyond the income of the property, in carrying on the business of the corporation or improving the mortgaged property, it was at liberty to furnish the means for that purpose; but it had no equity to ask that the expense and the hazards of doing so should be saddled on the first mortgagee, and the court had no jurisdiction or power to place it there.

Taxes are the first and paramount lien on all property, and must be paid. When taxes are due on property in the hands of a receiver, and he has no funds to pay them, the court will authorize him to borrow money for that purpose, and make the obligation given for the money so borrowed a prior lien on the property on which the taxes were due. This is not fixing a new or additional lien on the property, or displacing any prior lien. It is simply changing the form of the lien from one for taxes to one for money borrowed to pay the taxes.

The order and decree of the circuit court appealed from, which authorizes the receiver to borrow money to "be used and applied by said receiver for the purpose of preserving the property of the Denver Land & Water Storage Company in his possession and custody, and carrying out and maintaining the contracts of the company, now in existence, under and by which the company has heretofore sold tracts of land to various parties, which said contracts are referred to in the report of said receiver, and for such other purposes as are set out in said petition with reference to the maintenance, preservation, and protection of the property of the company," and which authorizes the receiver to issue his certificates of indebtedness for the money borrowed for these purposes, and makes such certificates of indebtedness the first and paramount lien "upon all the property, rights, and franchises now owned or controlled by the said the Denver Land & Water Storage Company," is void, in so far as it makes the certificates issued by the receiver a first and paramount lien on the lands embraced in the mortgages of the appellants, and is therefore reversed.