## FIRST UNION TRUST & SAVINGS BANK et al. v. BERNARDIN.

### No. 9426.

Circuit Court of Appeals, Eighth Circuit.

July 19, 1932.

John W. Kearns, of Chicago, Ill. (Burry, Johnstone, Peters & Dixon, of Chicago, Ill., Bowersock, Fizzell & Rhodes, of Kansas City, Mo., Bruce Johnstone and Guy M. Peters, both of Chicago, Ill., and Robert B. Fizzell, of Kansas City, Mo., on the brief), for appellants.

Massey Holmes, of Kansas City, Mo., (John J. Henry, of Kansas City, Mo., on the brief), for appellee.

Before STONE, KENYON, and VAN VALKENBURGH, Circuit Judges.

KENYON, Circuit Judge.

Appellants are trustees under a certain first mortgage deed of trust jointly executed June 1, 1922, by the Delta Land & Timber Company (herein called the Delta Company), a corporation of Delaware, and the Central Coal & Coke Company (herein called the Central Company), a corporation of Missouri, the owner of all the outstanding stock of the Delta Company (both referred to hereing as mortgagors), to First Trust & Savings Bank, a corporation of Illinois, as trustee, the Michigan Trust Company, a corporation of Michigan, cotrustee, Fidelity National Bank & Trust Company, organized under laws of the United States, Missouri trustee, and Melvin A. Traylor, individual trustee, to secure an authorized issue of $7,000,000 first mortgage bonds. A supplemental indenture of March 1, 1924, was executed by the same parties for further security of these bonds. At the time of the suit there were some $2,-076,200 of bonds due and unpaid, which were secured by said first mortgage deed of trust (herein called the mortgage). The First Union Trust & Savings Bank is the successor in trust of the First Trust & Savings Bank. The Delta and Central Companies' operations in coal, timber, and lumber business extended into a number of states, including Louisiana.

January 24, 1931, T. H. Mastin & Co. an unsecured creditor of the Delta Company, brought in the United States District Court for the Western District of Missouri, a creditors' bill, in which the appointment of a receiver for said company was asked. The Delta Company admitted the allegations of the bill, and appellee, J. M. Bernardin, was appointed receiver. A similar action was brought against the Central Company by the First National Bank of Chicago, and Bernardin was appointed receiver of that company.

April 3, 1931, the trustees under the mortgage filed a foreclosure bill in the same court in which receivers had been appointed of the Delta Company and the Central Company, in which a receiver was sought, and relief provided by the mortgage was asked. This foreclosure suit was by order of the court consolidated with the receivership causes, the receivership of Bernardin was extended to cover the same, and he was continued in possession of all the property, assets, and franchises of the mortgagors.

Bills of the same nature were filed in each jurisdiction in which the Delta Company or Central Company had property; also similar answers in each of said ancillary causes. Ancillary receivers were appointed, of which Bernardin was one, in each ancillary jurisdiction, and an order similar to that entered by the United States District Court for the Western Division of the Western District of Missouri extending the receivership and consolidating the causes was entered in the ancillary cause in each of such jurisdictions.

Prior to the institution of the suits against the mortgagors, the trustees under the mortgage had in their possession more than $200,-000 which had been paid to them pursuant to the provisions of article VII, section 6, of said mortgage in return for the release of certain properties from the lien thereof, and the sum of more than $3,500 was held by the trustees as a sinking fund provided for by article IV of said mortgage. The Delta Company was the owner of seventy thousand acres of cut-over land in Louisiana, which land was subject to the lien of the mortgage. Taxes for the year 1930 aggregating some $15,000

were due and payable on these lands, and a sale of the lands for the enforcement of these taxes was in prospect.

October 2, 1931, appellee, as receiver, filed an application asking instructions of the court as to whether the funds in the hands of the trustees under the first mortgage were subject to be used under the order and direction of the court to pay the 1930 taxes on the Louisiana lands for the preservation and benefit of the receivership estate, and stating that he had need of all the funds that would come into his hands from the operation of the estate "for the purpose of operating, maintaining and preserving the receivership estate." The prayer of the application was: "Wherefore Applicant prays the advice and instructions of the Court as to whether, and to what extent, said funds in the hands of the Trustee are, under the orders of this Court, subject to be so used; and, if the Court determines that such funds are subject to be so used, Applicant is of opinion that such use for the payment of said Louisiana taxes, before a sale of said lands for nonpayment of such taxes, would be to the best interests of the receivership estate, and asks the Court to direct and order such use for such purpose."

To this application the trustees filed answer in which it was stated: "That said sums were received and are held under and pursuant to all the terms of said mortgage and said supplemental indenture for the sole and exclusive use and benefit of the holders of the bonds secured thereby." And that: "The receiver is entitled to no relief whatsoever and cannot compel respondents, or any of them, to use said funds, or any part thereof, for taxes or other matters of any kind whatsoever, except with the approval and consent of said respondents."

A hearing was had on this application, at which it appeared that there was a large amount of delinquent and accrued taxes in various states on the real estate of the Central Company and the Delta Company, that the receiver had over $90,000 in the bank, which had resulted from the operation of the properties, but that he feared his cash would be run down by current operating expenses, that the $15,000 due in Louisiana could be paid out of the $90,000 cash on hand, but that such payment would merely hasten the day when the receiver would be out of money. The receiver testified that the Louisiana properties ought to be preserved for the estate, that the land was worth more than the taxes, and that unless paid a very heavy penalty approximating $3,000 would be assessed, that he pro-

posed in the preservation of the receivership estate to use the cash on hand to finance coal and lumber operations, which were a part of the business of the mortgagors, and did not desire to use the cash in his hands to pay taxes leaving the future operation of the business to take care of itself. There was some testimony as to the values of these lands ranging from $3 to $5 or $6 per acre.

This stipulation was entered into in the trial court: "It was agreed between the parties in open court by their respective attorneys that the Trustees under the First Mortgage have the power to declare all the bonds thereunder due and payable and that all said bonds issued and outstanding thereunder, aggregating $2,076,200 principal amount, have been declared due and payable."

The trial court made an order that so much as might be necessary of the funds, viz., $15,517.80, in the possession of the First Union Trust & Savings Bank, as trustee, be used for the payment of the 1930 taxes upon the Louisiana real estate. From that order this appeal is taken and presents a contest between the trustees and the receiver.

It is the theory of appellee that the funds in question are merely a part of the general trust estate with which the trustee is vested by the mortgage for "the equal pro rata benefit and security of all the bonds," and that they are usable at the direction of the receivership court to meet a necessary preservation expense, even though the trustees under the mortgage object to such use, and that the payment of taxes on the Louisiana lands is such preservation expense.

It is appellants' theory that the $200,000 release money constitutes a trust fund for the benefit of the bondholders who are protected by the mortgage, that the $3,500 of the sinking fund is a trust for the benefit of the bonds, and that the receiver is not entitled to possession or control of these funds. In short, that under the terms of the mortgage this money can be used only in payment of first mortgage bonds.

■ Did the court have the power to make the order appealed from, which compels the trustees to pay, over their protest, the taxes on the Louisiana land or to turn over funds to the receiver so to do from the moneys received before any of these suits were commenced from sales of part of the mortgaged property under the terms of the mortgage? The answer must be found in the provisions of the mortgage. We are dealing with particular rights under a particular contract.

The only purpose of giving the mortgage was to protect those who bought the bonds. Article 7 of the mortgage gave to the trustee under certain conditions power to release portions of the mortgaged property. Section 6 thereof provides in part as follows:

"Either of the Mortgagors, while not in default hereunder, shall also be entitled, upon payment to the Trustee in cash of the respective amounts hereinafter specified, to have any of the property subject hereto released by the Trustee from the lien hereof, * * * viz.:

"a. For release of any standing timber * * *; `

"b. For release of any unmined and recoverable coal * * *;

"c. For release of any cut-over timber lands * * *; .

"d. For release of surface * * *

"Any money so paid to the Trustee under any of the provisions of this Section 6, * * * shall be applied solely to the redemption of bonds in the manner mentioned in Article III hereof."

Reference is here made to article III, which provides for the redemption of bonds and sets forth the mechanism, not necessary to be detailed here, to be employed in said redemption, and then states: "The moneys so deposited with the Trustee, if equal in amount to the said principal, premium and interest on the bonds so called for redemption, shall on and after the date so designated stand in lieu of the security of this indenture, and shall be held by the said Trustee for and be paid by it to the holders of said bonds so called for redemption as and when the same, with all unpaid coupons attached thereto, shall be surrendered to the Trustee at any time thereafter, duly assigned to bearer if registered."

It would seem from these articles that the moneys paid to the trustees in exchange for releases of portions of the mortgaged property under the provisions of section 6, article VII, supra, constituted a trust fund held by the trustees as representatives of the bondholders and was to be applied solely to the payment of bonds. If the funds are to be regarded as standing in lieu of the mortgaged property from which they were derived, the taking of the same would be equivalent to disposing of property covered by the deed of trust.

■ The $3,500 in the sinking fund was also in the hands of the trustees before the appointment of the receiver. Section 1, article

IV, of the mortgage provides: "The mortgagors covenant and agree that they will create and at all times will maintain a sinking fund for the benefit and security of the bonds at any time issued hereunder, such sinking fund to be constituted as follows:"

The method in which said sinking fund was to be created is set forth in said article. Section 4 thereof provides that the moneys in that fund from time to time shall be applied upon request of the mortgagors toward the payment of principal of bonds secured by the mortgage as the same mature, and other provisions of said article relate to the use by the trustees of the money in the sinking fund for certain specified purposes. The sinking fund could be used to buy outstanding bonds, to pay for them, or to redeem them, and under the original mortgage could be used in buying additional properties; but this right was ended under the supplemental indenture. There is no doubt a trust was created in the sinking fund for the benefit of the bonds. The very purpose of a sinking fund is to create a reservoir from which moneys may be drawn for paying a funded debt. As said by the Supreme Court in Tennessee Bond Cases, 114 U. S. 663, 698, 5 S. Ct. 974, 992, 1098, 29 L. Ed. 281, "A sinking fund may be, and generally is, intended as a cumulative security for the payment of the debt with which it is connected."

It is not contended by counsel for appellee that the funds in question were not part of the trust that was created for the benefit and security of all the bonds, nor does it seem to be claimed that prior to default the mortgagors or the receiver could have compelled the trustee to use these funds in payment of taxes or otherwise than provided in the mortgage. It is argued, however, that after default the funds in question are no different in character from the other property held in the general trust created by the mortgage for the benefit and security of the bonds because:

"A. The *special* trusts, to which these funds were potentially subject before all the bonds became due and payable, having failed, the consequent *resulting* trust leaves these funds subject only to the *general* trust for the benefit and security of the bonds."

"B. The mortgage itself provides that when and after all the bonds have become due and payable, which event has occurred, these funds are thenceforth to be treated as identical in character with the balance of the general trust for the benefit and security of the bonds."

The argument is that the mortgage gave to the mortgagors and to them alone, so long as not in default, the privilege of transforming the funds from their general trust character as security for all bonds into a special trust for the payment of certain bonds as mortgagors might select whether the money came from the sinking fund or was paid in exchange for property released under article VII; that under article III no redemption was possible unless the mortgagors elected that there be such, nor unless the mortgagors should select and designate which bonds should be redeemed; that upon default the mortgagors had nothing to say as to the designation of these funds to the payment of such bonds as they might desire to have paid; that when the default occurred all the bonds became due and payable, and that when the mortgagors turned over their assets to a court of equity and consented that the court should make "decrees with respect to the property * * * as shall deal with the same on general equitable principles * * *" no redemption could be possible; that the mortgagors being divested of control could not provide money for the interest and premium necessary to be added to the face amount of the bonds in order to redeem the same; that therefore the possibility of transforming the funds into any special trust became extinct, and the situation is the same as though such trust had never been created; that as the special trust has failed the character of the funds is that of a component part of the general security for the bonds, differing only in kind from the machinery, mills, mining equipment, timber, coal, etc., vested in the trustees.

If this rather intricate and ingenious line of reasoning is sound, then the trustees and beneficiaries lost control over the funds, whether they were in the sinking fund or derived from releases of the property, upon default of all the bonds, and regardless of their protests these funds held in lieu of portions of the mortgaged property can now be taken from them and put back into the property for the benefit in part at least of those who were not provided for in the trust and at the expense of those whom the mortgage lien is supposed to protect, on the theory of preservation of the receivership estate. To arrive at any such peculiar result the intention of the parties so to do must be very clear. As in part sustaining this theory a portion of section 12, article VIII, is relied on to show that the mortgage itself provides that after all the bonds have become due and payable the funds in the hands of the trustees are to be treated as identical in character with the balance of the general trust for the benefit and security of the bonds. Article VIII covers the default provisions. A part of section 12 thereof is this: "Any moneys thus collected by the Trustees, and any other moneys in their hands after all the bonds have become due and payable, by the declaration of the Trustee, or otherwise, shall be applied by them in the same manner as the proceeds of any sale of the mortgaged property are herein required to be applied." It is contended that the phrase "any other moneys in their hands after all the bonds have become due and payable" covers the fund here under consideration. We do not think this sufficient to show any such intention of the parties to this mortgage as claimed by appellee. Section 12 is near the close of the default provisions, and apparently refers to moneys collected upon default and subsequent thereto. However that may be, the rights of the parties to the funds in which an express trust existed prior to the receivership cannot be changed by the provision of said section 12. Of course, after receivership the mortgagors having lost any control of the property could not exercise the privilege of transforming the funds into a special fund for the payment of particular bonds.

We think it an answer to the proposition that, as the beneficiaries of the trust were not changed prior to default, the trustees and beneficiaries lost all control over the fund and it can now be used by the receiver for the benefit of unsecured creditors or stockholders in the mortgagor companies, in that if the beneficiaries were not changed by substituting a certain group of bonds prior to default as provided by the mortgage, the original beneficiaries, i. e., the bondholders, as a class, remain as the sole beneficiaries of the fund. These funds stood in lieu of property upon which they had a lien under the mortgage.

Particular bondholders are not appearing and objecting to the order of the court. The controversy is not between different classes of bondholders. The bondholders as a class, represented by the trustees, are so objecting and insisting that the fund be applied to the purposes of its creation. We do not see that if the so-called special trust failed the situation as to these funds being in trust for the bondholders would be changed. They never passed into the possession or custody of the receiver as did other property of the mortgagors; they were segregated and set apart from the other mortgaged property and dedicated to a particular purpose. They were

paid to the trustees for the benefit of the bondholders whose rights thereto then became vested under the terms of the mortgage, and the appointment of the receiver did not divest the trustees of their control. The receiver is not entitled to the possession or the control of these funds. The general creditors have no interest in them and they cannot be used for the ordinary purposes of the receivership. Real Estate Trust Co. of Philadelphia v. New England Loan & Trust Co. (C. C.) 93 F. 701. The case of Brackett v. Middlesex Banking Co., 89 Conn. 645, 95 A. 12, 16, is somewhat in point in the present case. There the court's order gave to the receiver control of certain collateral held by the trust companies as security for the benefit of debenture holders. The appellate court pointed out that the order of the court below "required the trustees to accept other collateral substituted in place of that held by them as and when the receivers might elect." In practical effect, this is likewise the situation in the instant case. Here the trustees are being required to preserve security, the value of which is problematical and speculative, at the expense of security, the value of which is certain and easily realized. In Brackett v. Middlesex Banking Co., supra, the court said:

"The receivers, as a general rule, can do what the insolvent company could have done; they take its assets burdened with all valid liens and equities against it. * * * The trust companies held this collateral under the trust agreements as trustees for the benefit of the debenture holders. The mortgages deposited with them constituted a trust fund. The Banking Company had, until the debenture holders were paid, no right over this collateral except that of substitution of collateral of equal value. The receivers had no higher right than the Banking Company had. They could not interfere with, nor be given power to interfere with, the vested rights of the debenture holders in this collateral, nor could they take or be given possession of this collateral until the debentures were fully satisfied.

"When a debtor has deposited collateral with a trustee as security for the payment of his debt, the trustee cannot be compelled to surrender to receivers of the insolvent debtor the collateral until the debt is paid. And after default, if the trust be one to apply the proceeds of the collateral for the benefit of the secured creditor, the trustee is entitled to administer the trust as against the receivers of the insolvent."

See, also, Wright v. Seaboard Steel &

Manganese Corporation (C. C. A.) 272 F. 807; Kennison v. Kanzler (C. C. A. Ohio) 4 F.(2d) 315; Geddes v. Reeves Coal & Dock Co. (C. C. A.) 20 F.(2d) 48, 54 A. L. R. 282; Greenebaum v. General Forbes Hotel Co. et al. (D. C.) 38 F.(2d) 96; In re Dissolution Home Provident Safety Fund Ass'n of N. Y., 129 N. Y. 288, 29 N. E. 323; In re Directors of Binghampton General Electric Co., 143 N. Y. 261, 38 N. E. 297.

 If appellee's theory as to the effect of section 12 of article VIII were sound, then the funds in question would be subject to distribution as provided by section 11 of that article, but that section would not in our judgment warrant compulsory payment of taxes on the Louisiana lands out of these funds. The first and second provisions of that section are as follows:

"First. To the payment of all costs of the suit or suits wherein such sale may have been ordered, including all reasonable fees, disbursements and expenses of the Trustees and of any receiver or receivers appointed therein, together with reasonable attorneys', solicitors' and master's fees and all costs of advertisement, sale and conveyance;

"Second. To the payment of all expenses of the trust hereby created, including all moneys advanced by the Trustees, or the holder or holders of any bonds issued hereunder for taxes, tax deeds, assessments, abstracts, repairs, rents, royalties, mechanics' and other liens, insurance premiums, the discharge of prior liens or claims on the mortgaged property, or for any purpose authorized by this Indenture, with interest thereon at the rate of six per centum per annum."

These payments are to be made before payments on the bonds as provided in the third subdivision.

The language of section 11, which it may be noted applies to proceeds of sale of mortgaged property under foreclosure or power of sale granted in the mortgage, seems to be fairly plain. The first subdivision relates to costs of the suit, and has nothing whatever to do with taxes. The words "costs of the suit or suits" have reference only to the ordinary court costs of litigation taxable as such. Atlantic Trust Co. v. Chapman, 208 U. S. 360, 376–378, 28 S. Ct. 406, 52 L. Ed. 528, 13 Ann. Cas. 1155; Kansas City Southern Railway Co. v. Guardian Trust Co., 281 U. S. 1, 50 S. Ct. 194, 74 L. Ed. 659; Farmers' Loan & Trust Co. v. Oregon Pacific R. Co., 31 Or. 237, 48 P. 706, 38 L. R. A. 424, 65 Am. St. Rep. 822. If it dealt with taxes there would be no need of reference to taxes in the

second subdivision, which covers advancements by the trustees for taxes. Whether that means money advanced by the trustees personally or out of the funds of the estate is not important. It is to be noted, however, that the section is not limited to payment by the trustees out of their personal funds. If they do pay out of such funds, the moneys so advanced are made a lien prior to the bonds. The meaning of these paragraphs devoid of any strained construction is merely that out of the proceeds of sale under foreclosure or otherwise as provided by the mortgage the costs of the suit are to be paid, and if the trustees in their discretion have advanced money for taxes reimbursement is to be made.

The question of the payment of taxes is left to the discretion of the trustees by the express terms of the mortgage, a discretion which the order of the court would permit the receiver to usurp and exercise.

Section 2 of article XI provides: "In case the Mortgagors shall fail seasonably to pay any tax, assessment or other governmental charge upon the mortgaged and pledged property or any part thereof, or shall fail to pay when due any rent, royalty or charge constituting a lien prior to this Indenture upon any of the mortgaged property, or to procure and maintain insurance thereon as aforesaid, the Trustees may, at their option, pay such rent, royalty, tax, assessment or governmental or other charge, or procure and maintain such insurance, without prejudice, however, to any rights of the Trustees or the bondholders hereunder arising in consequence of such failure; and the amount of any and every such rent, royalty, tax, assessment or governmental or other charge and of any and every insurance premium at any time so paid by the Trustees, shall be repaid by the Mortgagors upon demand, with interest thereon from the date of such demand, at the rate of six per cent (6%) per annum, and shall become so much additional indebtedness secured by this Indenture, and shall be given a preference in payment over any of the bonds and coupons and shall be paid out of the proceeds of any sale of such property, if not otherwise paid by the Mortgagors; but the Trustees shall not be under any obligation to pay any such rent, tax, assessment or governmental or other charge, or to procure and maintain insurance, unless fully indemnified against the expense thereof or furnished with means therefor."

Section 1 of article XI provides: "The Trustees shall be under no duty in respect to any tax which may be assessed against them or against the owners of bonds in respect to the property hereby conveyed and mortgaged, or in respect to any other prior liens, or to see to the insurance of any part of the property hereby mortgaged, or to pay any rent or royalty or to perform any covenant provided in any leasehold or contract hereby conveyed."

The words of section 2, article XI, "The trustees may, at their option, pay such * * * tax," and "the trustees shall not be under any obligation to pay any such * * * tax," cannot be lightly brushed aside. The trust agreement did not obligate the trustees to pay taxes. Whether funds for payment of taxes should be advanced by the trustees is under the terms of the mortgage subject to their discretion. Whether an arbitrary abuse of such power could be corrected in a court of equity need not be here determined, as that question is not involved in this controversy. Certainly such discretion reasonably exercised should not be interfered with by a court of equity. In Nichols, Assignee, v. Eaton et al., 91 U. S. 716, 724, 23 L. Ed. 254, the Supreme Court said: "When trustees are in existence, and capable of acting, a court of equity will not interfere to control them in the exercise of a discretion vested in them by the instrument under which they act."

In Greenebaum v. General Forbes Hotel Co. (D. C. Pa.) 38 F.(2d) 96, proceedings were instituted by a trustee under a first mortgage for its foreclosure. A receiver was appointed. A policy of insurance on the life of the president of the mortgagor company had been issued which had been placed in the hands of the trustee as additional security. The receiver demanded that this policy be turned over to him. The court held the receiver was not entitled to the policy, saying at page 98:

"The trustee is the special representative of the bondholders and in him was vested the discretionary powers of continuing the policy by the payment of premiums or surrendering it upon the payment of its cash surrender value. This exercise of discretion is a very valuable right, and I see nothing in the bill, or the decree appointing a receiver, which divests the trustee of this right. * * *

"Being satisfied that the trustee is entitled to the policy, for whose benefit and those he represents the policy was taken out and assigned, and that he, alone, is entitled to exercise the discretion vested in him under the terms of the mortgage, the petition of the receiver must be dismissed."

Also: "It is clear, under the terms of

the mortgage, that the policy is held by the trustee as additional security as collateral, for the payments of the bonds. The law is well settled that the holder of an obligation, with collateral, cannot be compelled to surrender the collateral until the obligation is paid. In this case, it is plain that the policy is a trust fund for the bondholders, for which the trustee is responsible, and for which he must account. The rights of the receiver can rise no higher than the company which he represents and the hotel company could have no possible right to the policy as long as any bonds remain unpaid."

Appellee has not cited a single case in which a court was sustained in attempting to do what the District Court has done in the instant case. Instead he has relied upon authority to the effect that taxes represent a legitimate preservation expense, for the payment of which receiver's certificates may be issued and made a paramount lien upon the property so preserved, to the pro tanto displacement of all prior liens. Hanna v. State Trust Co. (C. C. A.) 70 F. 2, 9, 30 L. R. A. 201; Montgomery Coal Corporation v. Allais, 223 Ky. 107, 3 S.W.(2d) 180; Lockport Felt Co. v. United Box, etc., Co., 74 N. J. Eq. 686, 70 A. 980; 53 Corpus Juris, 193. It is a far jump from the displacement of one paramount lien by another for preservation purposes to what was here attempted to be done.

The Hanna v. State Trust Co. Case, supra, is a strong authority in favor of appellants. In that case the trustees under the first mortgage, as the trustees in the instant case, were parties to the receivership proceedings. The mortgagor company had been engaged in colonizing the lands, and had sold tracts to various purchasers under contracts that required the mortgagor company to plant fruit trees and cultivate the lands for a period of five years. The receiver stated to the court that he had no funds with which to carry out these contracts, or with which to pay some $4,000 taxes due, and that unless this were done the value of the contracts would be lost and the lands greatly depreciate in value. The court then authorized the issuance of receiver's certificates to obtain money with which to carry out the contracts and pay the taxes due, made the same a paramount lien on the property, and enjoined the trustees of the first mortgage from foreclosing their mortgage. On appeal by the trustees, this court reversed the decree of the Circuit Court except in so far as it authorized the issuance of certificates for payment of taxes and made them a para-

mount lien on the property *on which the taxes were due*. As to taxes the court said: "Taxes are the first and paramount lien on all property, and must be paid. When taxes are due on property in the hands of a receiver, and he has no funds to pay them, the court will authorize him to borrow money for that purpose, and make the obligation given for the money so borrowed a prior lien on the property on which the taxes were due." This the court points out does not create a new lien or displace an old one. It simply substitutes one lien for another, the lien of the certificate for the lien of the tax. No such situation is here presented. These taxes sought to be paid are not a lien on the funds in the hands of the trustees.

Appellant states that if appellee had applied to the proper District Court having jurisdiction of the subject-matter for authority to issue receiver's certificates, to be a lien *only* on the property on which he sought to pay taxes, that such application would not have been resisted. The Hanna Case would have been authority for this. A court having jurisdiction might well have issued certificates for payment of the taxes, and have made them a paramount lien, just as the taxes were before, on the property on which the taxes were due.

In Smith v. Shenandoah Valley Nat. Bank (C. C. A. 4) 246 F. 379, at page 381, it was said: "The rule is that receiver's certificates given for the operation of the business of a private corporation cannot be made to displace prior liens, unless the holders of such liens have waived them, either expressly or impliedly. The necessity for the continued operation of a railroad induced the Supreme Court of the United States to hold that a court of chancery having charge of railroad property might authorize the issuance of receiver's certificates for operating expenses, which would be a lien prior to the mortgage bonds. * * * Though not deciding the point, the court indicates in Wood v. Guarantee Trust Co., 128 U. S. 416, 9 S. Ct. 131, 32 L. Ed. 472, that such a power is not to be extended to receiverships of industrial corporations. Nothing can be added to the reasoning of Judge Caldwell against such authority in case of receiverships of private corporations in Hanna v. State Trust Co., 70 F. 2, 16 C. C. A. 586, 30 L. R. A. 201."

Under orders of this character a substantial part of the mortgaged estate could be absorbed in operation of the properties. The order here strikes down against the protest of their representatives some of the security

of the bondholders, or changes the character of the same and impairs rights created under a valid contract. By joining in the receivership proceedings secured creditors are compelled to accept a bird in the bush in lieu of one already in the hand. The following extract from the Hanna Case, supra, is quite in point: "The rights of the citizen, lawfully acquired by contract, are under the protection of the Constitution of the United States, and, like the absolute rights of the citizen, are not dependent for their existence or continuance upon the discretion of any court whatever. Constitutional rights and obligations are no more dependent on the discretion of the chancellor than they are on the discretion of the legislature. 'Rights,' says the supreme court of the United States, 'under our system of law and procedure, do not rest in the discretionary authority of any officer, judicial or otherwise.' In re Parker, 131 U. S. 221, 9 S. Ct. 708 [33 L. Ed. 123]." And the court in that case quotes with approval certain language of the court in Raht v. Attrill, 106 N. Y. 423, 13 N. E. 282, 60 Am. Rep. 456, in which is this: "It would be unwise, we think to extend the power of the court in dealing with property in the hands of receivers to the practical subversion or destruction of vested interests, as would be the case in this instance if the order of August 17th should be sustained. It is best for all that the integrity of contracts should be strictly guarded and maintained, and that a rigid, rather than a liberal, construction of the power of the court to subject property in the hands of receivers to charges, to the prejudice of creditors, should be adopted."

In Von Boston v. United Rys. Co. of St. Louis (C. C. A. 8) 8 F.(2d) 826, certiorari denied 271 U. S. 665, 46 S. Ct. 475, 70 L. Ed. 1140, it was said by this court, through Judge Scott, at page 831 of 8 F.(2d): "We fully recognize the principle announced by Knappen, Circuit Judge, in American Brake S. & F. Co. v. Pere Marquette R. Co. [205 F. 14], supra, that 'the authority, however, to disturb existing liens, should be exercised with great caution, and should be carried no further than actually necessary to attain the desired result.'"

The conclusion we think is inescapable that the District Court would not have had the power against the protest of the trustees to make receiver's certificates issued to pay taxes on the Louisiana lands a paramount lien on the two funds in appellants' hands. It follows a fortiori that it was beyond its power to direct appellants to pay the taxes on the Louisiana lands directly from those funds.

We refer to another phase of the case which in our judgment would necessitate reversal of the trial court's order. At the time the receiver desired to take from the funds in the hands of the trustees the money to pay taxes on the Louisiana lands, he had in his hands more than $90,000 belonging to the receivership estate. The record does not show just how this was accumulated, but as no claim is made that it was from releasing of properties under the mortgage it may be assumed that it came from carrying on the general business of the mortgagor companies. The receiver desired to retain this money and not to use it in the payment of these taxes. There is no reason why the Louisiana taxes should not be paid out of this $90,000. No objection appears in this record to the use of such funds to pay these taxes. This money cannot be retained for carrying on the operation of the properties at the expense of the lienholders and thus accomplish exactly what the Hanna decision says cannot be done. Under that decision the payment of taxes by any form of procedure which creates priority over the lien of an existing mortgage could only be when the receiver has no funds otherwise proper to be used for that purpose. Here the receiver apparently has ample funds with which to pay the taxes on the Louisiana lands, and this is sufficient ground for the denial of the application of the receiver.

It is our conclusion that the order appealed from cannot be sustained. The case is remanded with directions to set aside the order and enter one denying the application of the receiver.

Reversed and remanded.