**In re HOTEL GOVERNOR CLINTON, Inc.**

District Court, S. D. New York.
April 6, 1936.

PATTERSON, District Judge.

The debtor is under reorganization in a proceeding brought under section 77B of the Bankruptcy Act, as amended, 11 U.S.C.A. § 207. The particular problem is the disposition of a fund of $100,000 and interest, held by Central Hanover Bank & Trust Company as trustee and known in this proceeding as the tunnel fund. A committee representing holders of Series A bonds asks that the fund be applied toward payment of back taxes on the debtor's property. This is opposed by certain bondholders, who ask that the fund be distributed pro rata among the Series A bondholders.

The debtor owns real estate in New York City on which a hotel was built. To meet part of the cost of construction the debtor in 1928 issued and sold $5,000,000 Series A bonds and $1,500,000 Series B bonds, Series A having priority over Series B. The bonds were secured by first mortgage held by the Central Hanover as trustee.

By the first mortgage indenture the debtor deposited $5,442,000 in cash with the trustee, being part of the proceeds

of sale of the bonds. The indenture, in article V, section 2, provided that the $5,-442,000 should be held by the trustee "as part of the mortgaged property until paid out or applied from time to time" on certain specified terms. Those terms were: (a) That $3,800,000 should be paid to the builder; (b) that $40,000 should go toward real estate taxes; (c) that $795,-000 should be paid on interest on the bonds to and including April 15, 1930; (d) that $100,000 (this is the amount in dispute) should be paid to the debtor in reimbursement of the cost of a tunnel to connect the hotel with the Pennsylvania Station, on performance of certain conditions precedent, with the proviso that in case such amount should not be paid out by October 15, 1931, it should be applied by the trustee to the purchase of Series A bonds in the open market at or below the current redemption prices, and if sufficient bonds could not be so purchased then to be applied to the redemption of Series A bonds; (e) that $707,000 should be paid to the debtor to reimburse it for furnishings and equipment in the hotel.*

The tunnel was never constructed. The debtor having failed to pay the interest due on the bonds on April 15, 1931, the trustee did not apply the $100,000 to the purchase or redemption of bonds. It still has the money, together with a small amount of interest earned.

The indenture contained the usual provisions that the debtor should pay real estate taxes, and that in the event of failure the trustee might pay them. It also provided, in article VIII, section 12, that in case of sale of the property under power of sale or in judicial proceedings, the proceeds of sale, together with any other sums then held by the trustee under any of the provisions of the indenture "as part of the mortgaged property" (other than funds held for redemption or payment of particular bonds and coupons), should be applied to payment of expenses and of taxes and other superior liens, and thereafter to payment of bonds.

▮ No interest has been paid on the bonds since October 15, 1930. There are now accrued and unpaid real estate taxes

---

* The section, so far as it relates to the tunnel, reads:

"Section 2. At the time of the execution of this Indenture the Company has deposited with the Trustee the sum of $5,442,000 in cash, which sum, together with moneys added thereto as provided in subdivision (f) thereof (hereinafter referred to as "Construction Fund"), shall be held by the Trustee as part of the mortgaged property until paid out or applied from time to time on the following terms and conditions: * * *

"(d) $100,000 to or upon order of the Company in reimbursement of expenditures made or payment of liabilities incurred in the construction of a tunnel connecting the hotel to be erected upon the mortgaged property with the Pennsylvania Station, provided, however, that no such payments shall be made unless and until the Company shall have filed with the Trustee (a) a certificate signed by the architects named in the Building Contract or another firm of architects approved by the Trustee, stating that construction has been commenced upon such tunnel and that the same is being constructed in accordance with plans so that upon completion it will afford ready and convenient access to the hotel for the patrons thereof, and (b) an opinion of counsel (who may be of counsel to the Company) selected by the Board of Directors of the Company and approved by the Trustee to the effect that the Company has obtained all permits

and authorizations necessary for it to construct, operate and maintain such tunnel. Such payments shall be made from time to time upon written application of the Company, signed by its Treasurer or an Assistant Treasurer stating that specified expenditures had been made or liabilities incurred in the construction of such tunnel, accompanied by either (a) receipts or other vouchers satisfactory to the Trustee for such expenditures, in which event. moneys in reimbursement therefor shall be paid to the Company, or (b) bills for such liabilities, in which event payment shall be made by the Trustee to the persons purporting to be entitled thereto by virtue of such bills. In the event the said amount of $100,000 is not so paid out on or prior to October 15, 1931, or if on or prior to that date the Company shall not have filed with the Trustee the architects' certificate and opinion of counsel above provided for, said moneys shall be applied by the Trustee (and may be sooner so applied upon written request of the Company, signed by its President or a Vice-President and its Treasurer and Assistant Treasurer) to the purchase of Series A Bonds in the open market at or below the current redemption prices thereof, and if sufficient Series A Bonds cannot be so purchased to exhaust said moneys within a period of six months the balance shall be applied to the redemption of Series A Bonds."

against the property in an amount exceeding $700,000, and interest and penalties at the rate of 10 per cent. a year are running on this figure. The taxes are, of course, a lien superior to the first mortgage. Several plans of reorganization have been proposed and are now under consideration. No one disputes that the debtor's property has a value substantially less than the unpaid taxes and amount due on the Series A bonds. Proof has been taken which established that fact beyond controversy. In view of this fact no plan can be approved which does not recognize the Series A bondholders as the practical owners of the property, to the exclusion of junior interests that may be unwilling to put in new money.

There are now two motions before the court. One motion is for an order directing the immediate distribution of the $100,000 fund to the holders of Series A bonds proportionately. The other motion is for an order that the fund be applied forthwith toward the payment of back taxes on the property.

Both motions are in the interests of Series A bondholders, in the sense that no one else will be benefited. From a practical viewpoint the application of the fund to taxes is more advantageous. Such a disposition would cut down a prior lien that is drawing 10 per cent. interest while it runs and would thus protect the investment of these bondholders from a ruinous incumbrance. A distribution of the fund to the bondholders would involve considerable expense in the way of making payment and stamping bonds, and would net the bondholders something less than two per cent. on the face amount of their bonds. But the proponents of distribution maintain that under the indenture there is no alternative to a distribution. In my opinion that argument is unsound.

The $100,000 came into the trustee's hands as part of a fund of $5,442,000, to be held "as part of the mortgaged property until paid out or applied" for indicated purposes. The intended destination of $100,000 of the fund was a tunnel, but that aim became impossible. The alternative destination indicated in the indenture, after October 15, 1931, was purchase or redemption of some of the Series A bonds. That object likewise became impossible of fulfillment, at least of lawful fulfillment, since the debtor had defaulted on the bonds in April, 1931. For the trustee to have used the money for purchase or redemption of bonds in October, 1931, or later would have been a wrong on other bondholders, as well as an unlawful preference under section 15 of the New York Stock Corporation Law (Consol.Laws, N.Y. c. 59). So the trustee continued to hold the $100,000, and plainly the holding of it was "as part of the mortgaged property." To this day the trustee holds the $100,000, not for any particular purpose, but as part of the collateral security behind the bonds generally. This being the case, the court has power to direct that the money be used to reduce a prior incumbrance on the principal security for the bonds, an incumbrance that is mounting rapidly as time goes on.

I have not overlooked the authorities cited by those favoring a pro rata distribution among bondholders. Almost all of them present a situation where the fund in dispute came into the hands of the trustee impressed with a special trust, as for payment of particular bonds or particular coupons. The current of authority is that such a fund may not be diverted from such a trust toward other purposes, and that later clauses in the mortgage indenture relative to the use of money held by the trustee generally as part of the collateral do not operate to release the fund from the particular trust. Equitable Trust Co. v. Green Star S. S. Corporation, 291 F. 650 (D.C.N.Y.), affirmed (C.C.A.) 297 F. 1008, is typical of such cases. In the present case, however, the fund was received by the trustee as part of the general mortgaged estate and was to remain so until applied for particular uses, and the particular uses could not be lawfully achieved.

First Union Trust & Savings Bank v. Bernardin, 60 F.(2d) 419 (C.C.A.8), is closer to this case. There funds that had been received by the trustee for redemption of bonds were demanded by a receiver in equity for use toward payment of taxes on part of the mortgaged real estate. The bondholders opposed the application. The benefit from such a use, the court found, would be shared by unsecured creditors. The decision was that the bondholders' money could not be applied to payment of taxes over their protest, particularly since the receiver himself had funds sufficient to pay the taxes. The Bernardin Case, therefore, is one

where the use of the moneys for payment of taxes would have diluted the security behind the bonds. In the present case the proposal to use the $100,000 for payment of back taxes is one solely for the benefit of bondholders and is the measure supported by most of the bondholders.

The trustee will be directed to pay the fund in question to the proper taxing authority of the city of New York, on account of the accrued and unpaid taxes against the property. An order to that effect may be submitted on two days' notice.